In re CHOU–CHEN CHEMICALS, INC., Debtor.

Bankruptcy No. 3–82–01025.

United States Bankruptcy Court, W.D. Kentucky.

July 19, 1983.

J. Baxter Schilling, Louisville, Ky., Trustee.

B. Carlton Neat, III, Louisville, Ky., for John Wong.

Ben J. Talbott, Jr., Louisville, Ky., for Petrus Chou.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This opinion broaches that most delicate of subjects, attorneys' fees in a vigorously contested Chapter 11 proceeding. For the first time we entirely disallow the attorney's fees requested by a reorganization petitioner. The ground of disallowance is conflict of interest. We will write long and carefully.

Proper understanding of an intricate interplay of events requires that this opinion be divided into several parts. We will deal, in turn, with: (1) The *dramatis personae* in the action; (2) a description of the nature and character of the Chapter 11 petitioner and the events which led it here; (3) a narrative summary of the Chapter 11 proceeding to date, with emphasis on the role of counsel; (4) an analysis of the requests for attorneys' fees here under consideration, accompanied by a discussion of the controlling statutory and case law, and (5) our conclusion, a part of which has already been stated.

### I.

John Wong and Petrus Chou each own 50 shares of stock in Chou-Chen Chemicals, Inc., the petitioner. Two company employees assert equal ownership rights to a total of five shares, although their minority positions have always been contested and play no material part in our decision.

Carlton Neat represents John Wong and also held himself out as representing Chou-Chen Chemicals, Inc., thereby creating the conflict which receives our principal attention. Ben Talbott represents Petrus Chou. Baxter Schilling is the Chapter 11 trustee, acting as his own attorney.

### II.

Chou-Chen Chemicals, Inc. was engaged in the manufacture and brokerage of chemicals, doing business in its own name and eight others.

Wong, a chemist, supplied the expertise, and Chou supplied the capital for a corporation that had functioned for all practical internal purposes as a partnership.

The company initially had three equal stockholders, the third being one James Goei. The company prospered until 1982 largely by virtue of government chemical-supply contracts.

In February, 1982, a substantial cash shortage (about $400,000) was discovered and criminal charges were brought against Goei. The charges were later dropped, but Goei admitted the misappropriation and was terminated from all connection with the company, including his stock position.

The tensions generated by the cash drain and other matters not relevant here worked a divergence of management views between Wong and Chou that was and is absolute and irreconcilable. Corporate dealings with creditors were infected by the split, and in this opinion we will occasionally refer to the "Wong faction" and the "Chou faction" that prevailed in a business structure paralyzed by a hopeless deadlock.

By the time the reorganization petition was filed on May 10, 1982, Chou-Chen had debts in excess of a million dollars and assets—counting only those upon which the Wong and Chou valuations are in substantial accord—of only $362,000 [1].

John Wong retained Carlton Neat on April 23, 1982, for the dual purposes of gaining control of Chou-Chen and accomplishing its rehabilitation through Chapter

---

1. Certain coal brokerage commissions which may or may not be due the company are valued at little or nothing by Chou and at about $4 million by Wong.

11. A stockholders' meeting was convened on Wong's call on May 10, 1982. Chou attended but contested the validity of the call and the votes cast. Present at the meeting and voting with Wong on every point were the two employees holding nominal and disputed shares.

At that session Wong purported to elect himself as sole director, and thus acting, named himself president and hired Carlton Neat to represent Chou-Chen. Neat was specifically charged to file a Chapter 11 bankruptcy petition, which he did the same day. Neat's legal preparation toward that end had been going on for two weeks.

The conduct of the meeting and the challenge to the legitimacy of actions springing from it are not, regrettably, atypical of the minor pageantry that sometimes attends power struggles within closely-held corporations. Of the actions taken pursuant to the meeting it may be said that they were at best ineffectual and at worst wholly void. But for purposes of this opinion it may even be assumed, applying a pure legal fiction, that they were beyond reproach. Our result would remain unchanged.

Chou's reaction to the meeting was swift and direct. He sought and obtained restraining orders from state and federal courts to prevent Wong from further acting on behalf of Chou-Chen, a course of action that leads us to a discussion of the bankruptcy proceeding itself.

### III.

In the judicial view the Chou-Chen case started badly and worsened quickly. The reorganization petition was met at the federal courthouse door by a motion for a restraining order to prevent Wong from further pursuing it; companion actions against Wong in state court stood tolled by the automatic stay that accompanies a bankruptcy filing.

While the undersigned was conducting court elsewhere in the district a temporary restraining order was routinely entered by another bankruptcy judge, and within the alloted time a full hearing was scheduled on Chou's motion for a temporary injunction to further block the Chapter 11 proceeding.

That bellwether hearing forewarned of the many acrimonious sessions to follow. The intransigence of the opposing Chou and Wong factions generated much heat and just enough light to let the dispute stand revealed for what it was, a boardroom battle being waged in a Chapter 11 courtroom. A short recess was called.

In chambers, counsel were informed of the Court's position; confronted with the threshold question of Chou-Chen's authority even to file a petition, the resolution of which would require a substantive adjudication of the *ultra vires* issue under applicable state corporation law, the Court was not inclined to extend Chapter 11 protection from creditors even temporarily, until the standing-to-file question was resolved. As an alternative to a dismissal without prejudice, the court suggested the immediate appointment of an impartial trustee. Counsel agreed. A firmly understood condition to the appointment was that while both Wong and Chou factions would be free to contend with the trustee for the formulation of plans respectively favorable to them, the court would ultimately expect of the trustee, and rely predominantly upon, his own independent judgment.

In open Court the name of Baxter Schilling was drawn at random from the names of the standing trustees for the district. Schilling was a wholly neutral and disinterested party. He accepted the appointment fully aware of its difficulties and specifically charged to maintain an attitude of healthy skepticism and aggressive independence toward both factions throughout the performance of his duties.

The trustee's first need was for basic information. But Wong and Chou, afflicted with the paranoia born of mutual distrust, each refused to make the necessary information part of the record (and thus available to the other) without a protective order. It was granted. With that superabundant precaution the two factions supplied the required raw data. Not surprisingly, both

presentations took the form of a proposed plan.

The two proposals were markedly different; the Chou plan consisted essentially of a simple liquidation, with Chou buying out Wong at a price that would pay creditors 70 cents on the dollar or better. Wong envisioned a considerably more complex operating plan calling for renegotiation of government chemical-supply contracts, an expanded warehousing operation, the rejection of certain contracts rendered onerous because they had been underbid, and litigation over certain coal commissions allegedly due the company. Curiously enough, the Wong proposal contemplated a continuation of a dual management scheme, with the court orchestrating Wong's chemical knowledge and Chou's brokerage skills to the common good.

Neither of the plans are part of the official court record. They were provided to the trustee as working documents from which to formulate his own plan.

The trustee, averse to the role of arbiter in an ongoing shotgun wedding and conditioned by his successful past experience with prompt liquidations at a high dollar, constructed his plan essentially around the Chou proposal.

At about that time Neat, still on the record as representing Chou-Chen, began to challenge the trustee's advocacy of a reorganization plan for Chou-Chen. A vexed court was treated to the spectacle of the attorney who had filed the petition for reorganization and agreed to the trustee's appointment now challenging the reorganization of his own client. From that point forward Neat contested the trustee's progress toward a liquidation plan, even though Neat's own disclosure of his fee arrangement, filed with the original petition, envisioned a liquidation with legal fees to be paid "from the sale of assets."

The balance of the proceeding, through the confirmation hearing and beyond, may be accurately described as a welter of confusion and factional discord adequate to plumb the depths of judicial temperament.

Confusion concerning Chou-Chen's authority to file the petition in the first instance prompted the trustee to seek a determination of the effective date of the Order of Relief, for the purpose of considering whether certain prebankruptcy transfers of property might be attacked as preferences.

Confusion stimulated by the Wong and Chou factions within the creditors' committee resulted in one attorney being employed, then terminated and replaced by another. The creditors' committee, for a time dominated by the Wong faction, at first voted against "the Chou plan" in the belief that its rejection would resurrect "the Wong plan". From that position the committee later recanted.

Confusion concerning the acceptability and viability of a plan—any plan—prompted the renewal of motions by secured creditors to dismiss the proceeding or convert it to a Chapter 7 liquidation. The secured creditor Citizens Fidelity Bank, its protection eroding with the passage of time, continued to press for relief from the automatic stay in order to foreclose on the plant and warehouse.

Confusion reigned over whether certain claimants should be characterized as "insiders" and their claims disallowed, with each faction advancing its own claims and contesting those aligned with the opposing group.

The trustee filed his proposed disclosure statement on August 13, 1983. Wong objected. For the first time the name of Carlton Neat appeared on the record as representing John Wong instead of Chou-Chen Chemicals, Inc. Neat had neither requested nor received court approval to be relieved as counsel of record for Chou-Chen.

Although according to the record the shift in representation occurred on August 13, Neat's own law office records indicated that he had "changed hats"—if indeed he ever had two hats—as early as May 24. We will return to that point.

Beginning with the objection to the disclosure statement on August 13, Neat, now openly acknowledging his representation of

Wong, vigorously contested Schilling's each and every move toward confirmation of a plan. We will not belabor the reader with a further description of what we have already identified as tactics "to delay, obfuscate and abuse"[2] the bankruptcy process. The job is too great. The docket sheet lists 313 separate pleadings, ballots, memoranda and orders; some of the legal memoranda are themselves weighty tomes. The file is entering its seventh volume. Like an ill-healing chancre that continues to reopen, the Chou-Chen case demanded continuous treatment while 250 other Chapter 11 petitioners awaited our ministrations; the case has been in court for eleven separate hearings, most of them lengthy. It has generated three appeals. We have every reason to believe it will produce yet a fourth.

\* \* \* \* \* \*

At length the judge cried, quite out of breath, "I will give you your life if you will only stop fiddling."[3]

A final confirmation hearing was conducted on November 5, 1982, after much procedural maneuvering and predictable continuances. A preliminary tabulation of the ballots indicated that the trustee's plan might fail because of the single negative vote of John Wong.

The Court commenced the hearing with an announcement of that preliminary finding and stated that if the plan was denied confirmation for that reason, there would be restored to the docket the good faith question raised by the motions to dismiss. The clear implication was that upon dismissal on the ground of bad faith, then the person who filed the petition might be assessed the costs of the entire action, including legal fees. A short recess was called to allow claimants, particularly John Wong, to reconsider their votes.

John Wong stood by his negative vote. The plan failed.

The Court's announced intention to return to the good-faith issue jeopardized Schilling's measured progress toward an acceptable plan; upon a dismissal, all of his work would have been for naught. Now bedeviled on three sides instead of two and probably feeling as though he had been dropped squarely in the middle of a Bosch triptych, Schilling pleaded for an alternative to a good-faith hearing.

Schilling urged an immediate ruling on his pending motion for a "cram-down" confirmation—that is, a confirmation of the plan despite the single negative vote of John Wong. The "cram-down" issue had long since been joined and briefed; Wong and Neat were present with notice, and due process requirements had been fully satisfied; the only issue for the Court to treat was whether the trustee's plan was fair and equitable and in the best interest of creditors.

In a Chapter 11 court the judge, like it or not, sits as a chairman of the board in robes. Within the parameters of his statutory authority he balances and realigns conflicting economic interests for the good of the whole, to reach the end line question of whether a business continuation would benefit all concerned more than a business termination, and if so along what lines.

At every stage of an extended proceeding there looms that omnipresent question. Although the range of potential decisions may reach the judge in the *form* of legal pleadings, they require in *substance* the ongoing exercise of business, as well as legal, judgment. We leave it to wiser heads to reflect on whether judges make good businessmen,[4] for until such time as Chapter 11 is

---

2. Findings of Fact and Conclusion of Law accompanying Order of Confirmation, Nov. 9, 1982, at p. 9.

3. *The Jew Among Thorns,* The Brothers Grimm (1837).

4. Our colleague District Judge Robert Merhige of the Eastern District of Virginia concludes that judges do *not* make good businessmen and

avoids the exercise of the function. In the multimillion-dollar, multidistrict litigation that followed the Westinghouse announcement of default on nuclear waste disposal contracts, Merhige was asked in effect to revalue a complex national network of contracts; at the pretrial stage he required continual rounds of judicially supervised negotiations that vastly simplified what were essentially market questions.

radically recast we necessarily occupy that role.

So at the confirmation hearing, this court had to consider essentially three options: (1) To dismiss the entire proceeding, a most enticing thought; (2) to deny confirmation of the trustee's plan and entertain alternative proposals, including that of Wong, which was based in large measure on a continuation of divided management, or (3) to approve Schilling's plan and thus terminate a still deadlocked and nonfunctional company, permitting creditors to realize a prompt payout of 70 cents on the dollar.

We confirmed the plan.

### IV.

Turning now to the legal fees in the Chou-Chen case, we preliminarily note that Ben Talbott's fee has been placed beyond dispute; by our final order dated February 18, 1983, we found that he "rendered valuable service to the trustee and to this estate" and awarded a fee of $6,774.37.

█ Baxter Schilling has petitioned for payment of legal fees totaling $33,428.15 for the time period ending January 13, 1983. Schilling billed 242.25 hours at $75 per hour during calendar 1982 and 45 hours at $80 per hour for 1983, through January 13. The work of an associate, totaling 227.5 hours, was billed at $50 per hour.

An itemized time breakdown appended to the statement runs to 22 pages, with individual entries describing in detail the nature of the services rendered, the dates upon which they were performed and the time devoted to each. The statement is a meticulous and workmanlike document

carefully designed to withstand the most analytical appraisal.

This same trustee has recently withstood a severe judicial analysis of his billing practices. *In re Crutcher Transfer Line, Inc.*, involved a bankruptcy judge's disallowance of a substantial portion of the requested attorney's fees after an "evidentiary hearing" into the reasonableness of the charges. On appeal the judicial reduction of the fee was characterized as "clearly erroneous" and "unsupported by any finding of fact or conclusion of law."[5] The conduct of the hearing was criticized as unnecessary on the question of law presented. In reinstating the fee in its entirety, the District Court endorsed, although not by direct reference, the "lodestar" standard of reasonableness of attorneys fees.[6]

Stated most simply, that standard holds that the reasonableness of an attorney's fees is prima facie shown by a recitation of the hours devoted to the legal task at hand multiplied by a reasonable hourly billing rate. For its ease of mathematical computation, its basic fairness and its recognition of prevailing professional billing practices, the "lodestar" standard has been widely employed by courts;[7] the author of this opinion has carefully applied it both before and since *Crutcher Transfer Line.*[8]

Schilling's petition for fees in this case shows no request for a "bonus" considering the uniqueness of the issues presented and the legal results obtained. All of the time entries in Schilling's statement clearly describe services of professional character. His fee will therefore be approved in the full amount requested.

See *Florida Power & Light Co. v. Westinghouse Electric Co.*, 517 F.Supp. 440, 461 (E.D.Va. 1981).

**5.** *Crutcher Transfer Line,* supra, No. C 82–0345–L(B), Order of Jan. 27, 1983, at p. 4 (unreported).

**6.** *Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973).

**7.** *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir.1980). The Sixth Circuit has adopted the "lodestar" approach, *Northcross v. Board of*

*Education of Memphis City Schools,* 611 F.2d 624 (1979), as have bankruptcy courts. *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bkrtcy.App. 1st Cir.1982); *In re Photon Inc.,* 26 B.R. 693 (Bkrtcy.D.Mass.1982).

**8.** Our guiding philosophy in the matter of professional compensation continues to be that expressed in *Re Rennison,* 13 B.R. 951 (Bkrtcy. W.D.Ky.1981), and *In re Red Cross Hospital Assn.,* 18 B.R. 593 (Bkrtcy.W.D.Ky.1982).

848

Altogether different considerations appear in connection with Carlton Neat's fee application.

The conflict of interest question renders it unnecessary for us to subject Neat's time records to the same sort of content analysis we conducted in Schilling's case; the "lodestar" standard is effectively displaced by the conflict question. Suffice it to say that while Neat's records are neither typographically nor grammatically as precise as Schilling's, they are, apparently, photocopies of contemporaneous internal records from Neat's law office and therefore entitled to high credibility.

The time records are arranged in tabular form with entries in four columns, listing (a) the date upon which legal services were performed, (b) the name of the client, (c) an abbreviated description of the services rendered, and (d) the time spent on those services, expressed to the nearest tenth of an hour. Since the time records impeach Neat's affidavit concerning his representation of Chou-Chen, they will be further referred to in this opinion.[9]

Neat has requested payment out of the bankrupt estate of legal fees of $12,217.50 and expenses of $300.04 for the period April 23 to June 30, 1982. The billing rate is $75 per hour for a total of 162.9 hours for the period, and the fee requested is only part of a total billing of $43,230, the balance of which will presumably be directed to Wong for payment, although Neat's memorandum does not indicate the anticipated source of payment.[10]

The sole question we will now consider is whether Neat exclusively represented Chou-Chen Chemicals, Inc. between April 23 and June 30, 1982, and if so, whether his services resulted in a benefit to the estate. Our subjective observations on the point will be minimized if not eliminated by reference *only* to the following matters that appear in the written record:

1. The corporate resolution authorizing Neat's employment on May 10, 1982, was not, by its terms, retroactive; that is, there was no *ex post* ratification of Neat's efforts from April 23 to May 10.

2. A time entry of eight hours dated May 20 and presumably to be billed to "C.C. Chem." included "research concerning . . . authority of shareholders to commence bankruptcy proceedings . . ."[11]

3. On April 28, 1982, Neat wrote to James Goei under his law office letterhead. The opening paragraph of the letter stated:

This office represents Mr. John Wong in his efforts to satisfy the creditors of C.C. Chemicals, Inc. We are also attempting to protect the interests of the company's two (2) faithful employees, Richard J. O'Bryan and Michael A. O'Bryan.

4. On Neat's time records the column indicating the client's name consistently reads "C.C. Chem." from April 23 to May 21. But from May 24, 1983 forward, the entries consistently read "Wong, C.C. Chem."[12]

Confining our inquiry to the April 23—June 30 continuum, we can only conclude that (a) Neat represented Wong rather than Chou-Chen from April 23 to May 10; (b) held himself out as representing Wong on April 28; (c) conducted legal research for Wong on May 20, and (d) represented Wong continuously after May 24, 1982.

---

9. The time records are made an exhibit to this opinion for the purpose of appellate review but not for publication.

10. Also conspicuously absent from Neat's petition for payment is the customary sworn statement that the services "were performed for and on behalf of (the) debtor in possession and not on behalf of any committee, creditor or other person." *See* Form No. 9–102, 6 Collier on Bankruptcy IX–10 (15th Ed.1982).

11. The entry is open to dual interpretation: Neat *could* have been engaged in defensive research on behalf of a corporation, confronted with a shareholder who had filed or was about to file a petition. Obviously that was not his purpose, since it was Neat himself who had already filed the petition.

12. The "Wong, C.C. Chem." entries also may be viewed in two separate ways: Either Neat represented Wong *and* Chou-Chen, or Neat represented Wong *in the matter of* Chou-Chen. In either case there is a conflict.

We have admittedly indulged in a hyper-technical and literal analysis to make the point that a conflict existed. But there is nothing to prevent us from also considering Neat's conduct both before and after the time period for which he seeks payment from the bankrupt estate. It would be a betrayal of the judicial function to abstain from an overview of a continuing course of conduct which pervaded an entire proceeding.

The Chou-Chen case was a thorough abomination, and needlessly so. It was not the classic case of open combat between debtor and creditors, but one of internecine warfare between stockholders. Had Chou-Chen been independently and effectively represented, it would have enjoyed an exclusive period of 120 days within which to formulate and propose its own business reorganization plan, following which, even assuming nonacceptability of such a plan, other creditor plans could have been propounded, given equal dignity and considered in their proper order. But Chou-Chen was effectively without a voice in court. Carlton Neat represented the interests of John Wong first, last and always.

Having concluded that a conflict of interest existed in fact,[13] we must consider the case law to determine its impact on the fees requested.

*     *     *     *     *     *

Any discussion of conflict of interest must begin with the Supreme Court's authoritative pronouncement in *Woods v. City Nat. Bank & Trust Co. of Chicago,*[14] a 1941 reorganization case under Chapter X of the Chandler Act. Claims for compensation filed by an indenture trustee, a bondholders committee, and counsel representing them both, were all disallowed. With particular reference to the role of counsel, the Court commented that:

> Where a claimant ... was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted.[15]

*Woods* sanctions broad latitude in a bankruptcy court's analysis of the conflict of interest question, made necessary by its mercurial nature:

> (T)he incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need not speculate as to whether the result of the conflict was to delay action where speed was essential ... Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation.[16]

Although nominally decided on the narrow statutory ground of entitlement to compensation, *Woods* actually has its genesis in the broadest ethical norms, running as deep as the pre-Biblical injunction to do good and eschew evil. Denial of compensation in the case of a conflict is designed to eradicate "not only evil results but their tendency to evil in other cases" and to "keep the standard of fiduciaries 'at a level higher than that trodden by the crowd.' "[17] As we will see, that mode of thinking runs as an unbroken thread through the fabric of bankruptcy case law.

In *Re Philadelphia Athletic Club Inc.,*[18] a Pennsylvania District Court reversed a

---

**13.** Following the admonition of *Crutcher Transfer Line,* we have made this factual determination solely upon the record and without an evidentiary hearing. The *Crutcher* approach has been effectively ratified by the Sixth Circuit in *General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704 (6 Cir.1982), holding that an evidentiary hearing was not necessary to support an order disqualifying an attorney who was an essential witness. The words of the Circuit ring true: "Here the 'evidentiary hearing' would be a mud-slinging match ..." and "would have been a distasteful, even ob-noxious procedure, besides being a waste of judicial resources and a prolonger of the litigation." *Id.* at p. 711.

**14.** 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820.

**15.** *Id.,* 61 S.Ct. at 497.

**16.** *Id.* ·

**17.** *Ibid.* (citations omitted).

**18.** 20 B.R. 328 (D.C.E.D.Pa.1982).

bankruptcy judge's appointment of an attorney for the trustee who had previously represented the owners of 50 per cent of a noncorporate entity which in turn owned the corporate debtor. The District Court stretched to reach the point in an appeal from an order that was clearly interlocutory.[19] In a redundancy for the sake of emphasis the court twice noted that "the avoidance of a real appearance of impropriety is of chief concern to a court of bankruptcy,"[20] and held itself bound by the appropriate Canon of Professional Responsibility to "view the conduct as an informed and concerned private citizen and judge whether the reputation of the Bar would be lowered if the conduct were permitted."[21]

*In re King Resources Co.*[22] denied compensation to an attorney who had been simultaneously retained by an acquiring company and a target company in an abortive corporate takeover which resulted in the latter concern filing for bankruptcy reorganization.

Addressing the same point we consider here, the District Court for Colorado in *King Resources* observed that "(o)nce employed by a corporation, a lawyer owes his allegiance to the entity and not to the stockholder, director, employee, representative or other person connected with the entity."[23] The court went on to hold, in applying appropriate canons of professional responsibility of the American Bar Association, that:

> "It is well settled that where an attorney is shown to represent more than one party with conflicting interests, a court may deny him all compensation under a retainer agreement ... The attorney will not be heard to argue that the conflicting

interests had no effect upon his conduct. It is presumed that harm to the client has resulted ..."[24]

The Western District of Michigan has also ruled recently that a bankruptcy judge "possesses the discretionary power to deny attorney fees *solely* upon the basis that the attorney's representation was subject to conflicting interests."[25] *In re Paine* sustained a bankruptcy court's denial of a fee for representation of a defendant in an involuntary bankruptcy proceeding because of the attorney's coterminous representation of numerous unsecured creditors. Because the "dual representation included the sensitive period of time in which Paine's schedules were prepared for the involuntary bankruptcy proceeding,"[26] and further because the multiple representation was unknown both to the parties and to the court, a fee of $1,313 was disallowed even though stipulated by the parties to be "reasonable if viewed against the competency of the work performed and value of the services to the estate."[27]

*In re Paine* is the most recent of a long line of "fee penalty" cases,[28] but goes a step further in holding that bankruptcy courts have inherent power to assess a penalty for violation of professional canons, *notwithstanding* the absence of express statutory authority. Like the cases previously cited, *Paine* draws from the deep wellspring of ethics and public policy:

> "(A)warding fees to attorneys whose representation was subject to conflicting interests would have the undesirable effect of undermining public confidence in the integrity of the judicial function, particu-

---

19. 20 B.R. at 331–332.

20. 20 B.R. 335, 338 (citations omitted).

21. 20 B.R. at 335.

22. 20 B.R. 191 (D.C.Colo.1982).

23. *Id.,* 20 B.R. at 200.

24. *Id.,* at 204.

25. *In re Paine,* 14 B.R. 272 (D.C.Mi.1981) (Emphasis original).

26. *Id.,* 14 B.R. at 273.

27. *Id.*

28. See *Weil v. Neary,* 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243 (1929); *Gillette v. Newhouse Realty Co.,* 75 Utah 13, 282 P. 776 (1929); *In re Deavers,* 7 B.C.D. 277 (D.D.C.1981).

larly regarding bankruptcy proceedings." [29]

Based upon the same broad reasoning is a recent bankruptcy decision not only disallowing attorneys fees but ordering a refund of fees already received, because of a conflict of interest. *In re 765 Associates* [30] viewed the rule against conflicts as "founded upon principles of public policy" and necessary to "further the orderly administration of justice and to foster respect for the profession and the courts." [31]

Our inquiry has centered on the case law because the statute authorizing compensation offers no real guidance. [32] The applicable canon and rules of professional ethics speak clearly for themselves. [33]

■ A review of the cases leads to the conclusion that once a conflict of interest is shown, attorneys fees should be entirely denied, even though the services rendered had intrinsic value and brought a benefit to the bankrupt estate.

Our readings, however—and they include all of the reported bankruptcy opinions on

the point—still leave something of an intellectual void. All of the cases draw such strength as they have from the vast reaches of ethics and morality. They are united primarily by the conclusion that a conflict of interest is a bad thing and should not be rewarded.

But bankruptcy proceedings are not morality plays, and this court does not sit in enforcement of the Ten Commandments. Nor, for that matter, do we feel comfortable in the role of a committee of one on professional responsibility. [34] While we agree with the ethical norms recited in the cases, in the conclusion of this opinion we will offer a different and more practical analysis of the conflict-of-interest rule, to explain exactly why it should be judicially applied in an extradisciplinary context. [35]

## V.

In civil law countries, courts operate within a system of inquisitorial justice, with

---

**29.** 14 B.R. at 272.

**30.** 14 B.R. 449 (Bkrtcy.Hawaii 1981).

**31.** *Id.,* 14 B.R. at 451.

**32.** 11 U.S.C. § 330(a)(1) allows "reasonable compensation for actual, necessary services rendered by such ... attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title ..."

**33.** Canon 5 of the American Bar Association Model Code of Professional Responsibility provides: "A lawyer should exercise independent professional judgment on behalf of a client."
Ethical Consideration EC 5–18 states that "a lawyer employed by a corporation owes his allegiance to the entity and not to a stockholder, director, officer, employee or other person connected with the entity;" cited in *King Resources,* see text accompanying note 23 supra.
Disciplinary Rule DR 5–105 requires "refusing to accept or continue employment if the interest of another client may impair the independent professional judgment of the lawyer."
The Canons in their entirety are made applicable in Kentucky by SCR 3.130.

**34.** An impartial forum, and not the judge before whom the questionable conduct occurred, should make the determination. The conflict in this case might have been circumstantially cre-

ated and not the product of any wrongful motives on Neat's part. Disciplinary action may or may not be justified by judgmental error.
Many lawyers have found the lines of representation less than clear where, for example, individual client A forms corporation B which then becomes controlled by C; a single lawyer may find himself tempted to represent A, then B and C, nominally for different purposes but all in the interest of business continuity and expediency. The ethical boundaries are tricky. At the corporate closing table the entire metamorphosis may take place in mere minutes.

**35.** That we *should* address ethical questions is required by the Sixth Circuit, see *General Mill Supply,* supra note 13; the reason *why* rests on the broad grounds we have heretofore discussed. Under the heading, "The public interest," Judge Engel wrote: "The public interest demands a seemly and efficient use of judicial resources towards the just, speedy, and inexpensive remedy spoken for in Fed.R.Civ.P. 1 ... The court should *sua sponte* raise ethical problems involving danger to a just, speedy, and inexpensive remedy, even if the parties do not." *Id.,* at 711–12. (Emphasis original).
Insofar as correction of unethical behavior is concerned, however, courts do not act, but rather are required by their own code and by state law to refer such matters to the proper forum; *see* Code of Judicial Conduct for United States Judges, Canon 3 B(3); KRS 26A.080.

jurists performing a management role in the arbitration, mediation and compromise of disputes. There is much good to be learned from the system, particularly for bankruptcy courts, which without a jury constantly reapportion losses and restructure multiple contract rights and duties in the Chapter 11 context of commercial failure.[36]

But the American system is one of adversarial justice, in which courts make clear and comparatively simple choices between conflicting claims. The adversary system requires as a minimum condition a clear identification of the parties to a dispute.[37]

Strictly speaking the conflict of interest rule is a necessary adjunct to the adversarial method and therefore to the justice system itself, in that it defines and protects the boundaries of competing interests within the framework of any given litigation. Proper judicial perspective may be gained only by knowing exactly where those boundaries lie.

The lawyer working under the burden of a conflict of interest does a disservice to his court and runs the risk even of subverting the justice system. If a lawyer holds himself out as representing one party, but in reality represents another, either in addition to or instead of his stated retainer, that lawyer distorts the judicial perspective.

As officers of the court, lawyers frame issues and contend for results only as they might affect known interests. Judges direct their thinking and frame their decisions along the lines presented to them, the only lines they are allowed to know.

If a conflict of interest exists a court decision may impact in an unintended way or touch a party not meant to be reached by the judicial hand.[38] The judicial function is particularly abused where, as here, one client is acknowledged but another is unspoken. A decision intended for the real party in interest may reach only the putative client or vice versa. Such a decision may unwittingly or with inadvertent force adjudicate rights not directly in issue. Judicial error, not necessarily correctible, can be created out of mistaken identity and the confusion of interests.

In a most practical way such a result could be described as "indirect adjudication," a concept foreign to basic notions of decency and fair play.

To further make the point in the case before us, if the court had tailored an ultimate decision along the lines urged by Neat while he was still counsel of record for Chou-Chen, the result would have been to commit the corporate debtor to a future of divided management and protracted litigation of questionable outcome,[39] a result hardly in the best interest of either the debtor or its creditors. At the same time we would have elevated Wong, by the acceptance of "his" plan, to a position of

---

36. We use "inquisition" in its positive definition: "A judicial or official inquiry or examination," *Webster's New Collegiate Dictionary* (1979 Ed.). The inquisitorial method is of course adaptable to any court system; Judge Merhige certainly used it to wholesome effect, see note 4 supra.

37. Carlton Neat, even while assuming an adversarial posture, argues that "the reorganization process is not an adversarial process." Memorandum in Support of Fee Request, citing *In re Curlew Valley Associates,* 14 B.R. 506 (Bkrtcy.D.Utah 1981). Technically speaking, it is not; but the natural tensions between competing claimants against limited assets, both among themselves and against the debtor, give every Chapter 11 proceeding an adversarial nature.

38. Obviously many judicial opinions may have some effect, if only as precedent, beyond the resolution of the dispute at hand. But here we are not referring to the broad socio-economic impact of judge-made law which has inspired numerous jurisprudential treatises; *see,* e.g., Posner, *The Economics of Justice* (Harvard University Press 1981). We allude to the more measurable effect of a specific adjudication on the economic interests of a person, party or nonparty to the litigation, whose interests in the absence of that particular decision would have remained unaltered.

39. Although the "Wong plan" was never formally presented, it was the subject of considerable courtroom debate and its goals were generally known. The litigation to which we refer involved the disputed coal commissions, supra note 1.

ascendency over his coequal shareholder, Chou. Wong thus would have staged a management coup through the use of the bankruptcy court process without even having been represented by counsel of record.

To the extent, then, that the conflict-of-interest rule forms an integral component of the judicial function, we must address it directly where it appears.

 Our early attitude toward the matter at hand was to solve it through a Solomonic award of only a partial fee, to match the treatment accorded Talbott.[40] A review of applicable case law has persuaded us that to award any fee at all would require a finding that no conflict of interest existed, a finding which on this record would be reversible error. Thus we have treated at length and with reluctance this sensitive question.

The foregoing constitutes our findings of fact and conclusions of law to accompany a final order concerning the disputed attorneys fees, which will be entered today. As we have done in other matters predestined for appellate review,[41] we encourage these parties to take any resulting appeal directly to the Sixth Circuit Court of Appeals, in the interest of finality and economy.[42]

---

**40.** Talbott's initial fee request of $15,000 was reduced voluntarily, subject only to such negotiating pressure as the trustee may have brought to bear.

**41.** See *In re Brame*, 23 B.R. 196 (W.D. of Ky. 1982).

**42.** Direct appeal by agreement is authorized by 28 U.S.C. § 1293(b). Economy is of particular importance in this case. The confusion generated by the conflict of interest, being perpetuated by the appeals still pending, has resulted in additional and unnecessary expense to the estate, perhaps as much as $20,000 in legal fees to Schilling alone.