In re NATIONAL LIQUIDATORS,
INC., Debtor.

Bankruptcy No. 93–56266.
EIN: 31–1224412.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Sept. 9, 1994.

Myron S. Terlecky, Columbus, OH, for debtor.

Alexander G. Barkan, Atty. in Charge, of U.S. Trustee, Columbus, OH.

Thomas R. Noland, Chapter 11 Trustee, Altick & Corwin, Dayton, OH.

David M. Whittaker, Examiner, Columbus, OH.

Brenda L. Dodrill, Asst. U.S. Atty., Columbus, OH.

Scott Hamilton, S.E.C., Chicago, IL.

John J. Dilenschneider, William M. Todd, David Cooper, Jr., Squire, Sanders & Dempsey, Columbus, OH, for unsecured creditors' committee.

George M. Hoffman, Roetzel & Andress, Columbus, OH, for petitioning creditors.

Bonnie I. O'Neil, Thompson, Hine and Flory, Columbus, OH, for 20 largest creditors.

### MEMORANDUM OPINION AND ORDER ON TRUSTEE'S OBJECTION TO APPLICATION FOR FEES AND EXPENSES OF SQUIRE, SANDERS & DEMPSEY AS COUNSEL FOR THE COMMITTEE OF UNSECURED CREDITORS

CHARLES M. CALDWELL, Bankruptcy Judge.

On June 23, 1994, the Court conducted a hearing on the Trustee's Objection to Application for Fees and Expenses of Squire, Sanders & Dempsey ("SSD") as Counsel for the Committee of Unsecured Creditors. The Objection of the chapter 11 Trustee, Thomas R. Noland ("Trustee"), was based upon SSD's simultaneous representation of the Creditors' Committee and Miguel A. Lucas, an individual member of the Committee and co-chairperson of the Committee. At the conclusion of the hearing, the Court rendered a ruling on the record with a written memorandum opinion and order to follow, given the significance of the issues and sums involved.

The circumstances of this case are unfortunate, and the task of rendering this decision is unpleasant. The Court is at a loss to understand how highly competent and sophisticated counsel as SSD can find itself in this predicament. There are clear statutory prohibitions and warning signs associated with SSD's dual representation that should have led even the most casual bankruptcy observer to pause. The possibility that this estate may bear the expense of, and this Court must take the time to rule upon issues that in its opinion are statutory "no brainers," is frustrating. The only consolation is that on occasion, by restating the obvious, some educational benefit may be derived.

On October 13, 1993, an involuntary petition under chapter 11 of the United States Bankruptcy Code was filed against National Liquidators, Inc. ("Debtor"), and on October 14, 1993, the petitioning creditors filed a Motion to Appoint Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(a) of the United States Bankruptcy Code. The allegations in the trustee motion included the disappearance of Vance K. Wolfe ("Mr. Wolfe"), the principal and founder of the Debtor, and the alleged disappearance of eight million dollars. The Debtor consented to adjudication under chapter 11 on October 25, 1993, and on November 2, 1993, the Court ordered the appointment of an examiner. David M. Whittaker served as the examiner ("Examiner"). On November 5, 1993, the United States Trustee appointed a Creditors' Committee ("Committee"), comprised of investors and trade creditors.

Almost simultaneously with the bankruptcy filing, the Securities and Exchange Commission ("SEC") filed on October 29, 1993, a civil action in the United States District Court for the Southern District of Ohio, Eastern Division, Case No. C2–93–0104. This action was based upon alleged securities law violations, related to fraud, and the SEC sought injunctive relief against the Debtor and Mr. Wolfe. The Committee unsuccessfully sought to intervene in this litigation due to the opposition of the SEC.

Subsequent to appointment of the Examiner and issuance of his initial report, the United States Trustee filed a Motion to Convert to Chapter 7 on February 22, 1994. The bases for this motion were: the alleged fraudulent activities identified by the Examiner, the apparent lack of viability of the continued operation of the Debtor's business, and the need to appoint, "... a single, accountable, Chapter 7 trustee ..." to pursue avoidance actions for the benefit of creditors. On February 23, 1994, the SEC filed a Statement in Support of the Motion to Convert. In relevant part, this Statement expressed agreement with the necessity of the appointment of an impartial trustee to investigate and pursue alleged fraudulent transactions, which could not be done by the Debtor or members of the Committee that may be involved in any recovery actions.

The Court recalls that both the Debtor and the Committee voiced opposition to the United States Trustee's Motion to Convert, primarily based upon the increased administrative expense that may be incurred by a chapter 7 trustee and any related professionals. Based upon an agreement among the parties, however, including the Debtor, the Committee and the United States Trustee, on April 8, 1994, the chapter 11 Trustee was appointed in lieu of conversion to chapter 7.

A brief history of the Debtor's business will be helpful in understanding this Court's decision. The Court has gleaned information from the reports of the Examiner. According to the Examiner, the business enterprise of the Debtor was commenced by Mr. Wolfe in late 1989 or early 1990 for the purpose of serving as a wholesaler for distressed or liquidation merchandise. In 1991, Mr. Wolfe sought investors to provide capital for the Debtor. Initial investors were friends or acquaintances of Mr. Wolfe.

According to the Examiner's reports, parties would be asked to contribute funds to purchase specific merchandise. In exchange, Mr. Wolfe would sign a brief document specifying the transaction by a "deal" number, including the amount of the funds contributed and repayment arrangements. Typically, parties were promised a return of approximately 30% within 90 to 120 days. The size of the return, as explained to investors, was possible due to skill in purchasing distressed products and reselling them immediately for large profits.

The Examiner reports that the initial transactions were profitable because of the substantial increase in the number of investors and level of funds available to pay as returns on investments. There were as many as 1,100 investors, and some investors through the auspices of Mr. Wolfe became group leaders. Group leaders had as their task the location of additional investors for the Debtor, for which they would derive a commission. The Examiner surmised that there may have been as many as 10 or 12 group leaders.

The Examiner expressed the belief that initially there were acquisitions of distressed products that resulted in profits. With the receipt of significant returns, investors began to reinvest their profits in subsequent deals. The Examiner surmised that as the level of investor funds increased, so did the number of fictitious transactions.

The Examiner expressed the belief that the funds, rather than being used to buy products, instead began to be used to pay the operating expenses of the Debtor and to capitalize its rapid expansion and acquisition of other business enterprises; i.e., $1–$2–$3 Super Discount Stores and N.L. Leathers. The Examiner concluded that some of the funds were used by Mr. Wolfe personally to purchase a home at a cost of $284,000, a 1993 Mercedes at a cost of $79,210.70, and a 1993 Southwind RV at a cost of $73,995.00. According to the Examiner, Mr. Wolfe maintained complete control over the investor accounts.

The Examiner indicated that potential causes of action might include fraudulent conveyance proceedings against Mr. Wolfe and preference actions against the investors, all together involving millions of dollars. Indeed, the Examiner concluded his last report with the recommendation that avoidance causes of action be pursued as soon as possible. Based upon the Examiner's recommendation, the once substantial business operations of the Debtor, that included as many as

100 employees and a 88,000 square foot warehouse and distribution center, ceased. A substantial portion of the tangible assets have been sold, and all that remains is the pursuit of avoidance causes of action.

With this background in mind, we turn our focus to the issue at hand. On November 9, 1993, an Application by Unsecured Committee to Employ General Counsel was filed in which the Committee sought to retain SSD as its counsel. This Application is signed by Miguel A. Lucas. The retention application of SSD included the requisite affidavit of counsel in which all connections and interests are to be fully disclosed. The affidavit, while more notable for what it did not contain, as will be more fully discussed below, set forth:

> Said law firm has not represented any creditor in connection with this case, or any person having an interest adverse to the creditors herein. Said firm will not represent any other entity in connection with the debtors.

Based upon the retention application and the attached affidavit, and the absence of any opposition, on December 1, 1993, the Court entered an Order Authorizing the Employment of Counsel for the Committee as requested.

This was the only information available to the Court until on or about May 6, 1994, or approximately six months later, when SSD filed the instant application[1] and stated:

> It is important to note that during the period in question an SS & D attorney, Phillip Lehmkuhl, provided certain limited professional services on a personal basis to Miguel Lucas, a member of the Creditors' Committee. Those services were provided in connection with an ongoing SEC investigation of Miguel Lucas. SS & D did not represent Mr. Lucas as a creditor or equity holder in this chapter 11 case, nor did such representation render SS & D not "disinterested" as that term is used in §§ 328(c) and 101(14) of the Bankruptcy

Code. Moreover, SS & D believes that these services could not reasonably be construed as representing or holding an adverse interest (Cf. § 1103 of the Bankruptcy Code).

On June 21, 1994, the Trustee filed an Objection to the compensation application of SSD. Correspondence between the SEC and Mr. Lehmkuhl of SSD is attached to the Objection.[2] Specifically, in a letter dated February 18, 1994, from the SEC to Mr. Lehmkuhl, it is stated:

> This letter confirms our conversation on February 17, 1994, concerning the rescheduling of the deposition and document production of your client, Miguel Lucas. This letter confirms that Mr. Lucas will assert his Fifth Amendment privilege and refuse to answer certain questions posed by the Midwest Regional Office (of the SEC) concerning his specific involvement with National Liquidators, Inc. and Vance K. Wolfe. You stated that if (the SEC) deposes Mr. Lucas, he will assert his Fifth Amendment privilege against self-incrimination to any and all questions regarding the following topics:
>
> 1. National Liquidators, Inc. ("NLI") and all of its affiliated entities, its employees and independent contractors;
>
> 2. NLI Investors and NLI Liquidation Deals;
>
> 3. Acquisition and disposition of NLI investor funds;
>
> 4. Mr. Lucas' activities as an NLI independent contractor;
>
> 5. Mr. Lucas' activities regarding NLI Liquidation Deals;
>
> 6. Mr. Lucas' activities as a "Group Leader" for NLI;
>
> 7. Mr. Lucas' acceptance and disposition of funds from investors in NLI Liquidation Deals;
>
> 8. Mr. Lucas' representations to investors in NLI Liquidation Deals;

---

1. SSD seeks compensation for legal services in the amount of $55,000.00 and expenses in the amount of $6,737.11. SSD represents that its customary fee would be $87,550.00 in addition to the requested expenses. No explanation is given for this forbearance.

2. This correspondence was attached to the Statement of the SEC in Support of the Motion to Covert, but unfortunately was not noticed by the Court until the Trustee filed his objection to compensation.

9. Mr. Lucas' activities that relate to the anti-fraud provisions of the federal securities laws; and

10. Allegations in the Commission's complaint concerning activities that violate the anti-fraud provisions of the federal securities laws.

You also stated that Mr. Lucas will refuse to produce any personal documents he possessed pertaining to the above-referenced items, once again asserting his Fifth Amendment privilege.

You indicated that Mr. Lucas will provide sworn testimony concerning the following areas:

1. Vance K. Wolfe and acquisition and disposition of Wolfe's personal assets;

2. Mr. Lucas' activities as they relate to the registration provisions of the federal securities laws; and

3. Allegations in the Commission's complaint concerning activities that violate the registration provisions of the federal securities laws.

You further indicated that you would make Mr. Lucas available for an informal interview to discuss these areas.... Based upon these representations, we will postpone Mr. Lucas' deposition and his document production of personal records provided that you first provide us with a copy of this letter, signed by your client, on or before March 4, 1994. If Mr. Lucas refuses to sign this letter, we will proceed with his deposition on March 29, 1994, at 9:30 a.m.

.    .    .    .    .

On March 4, 1994, Mr. Lehmkuhl corresponded with the SEC and stated:

Please find enclosed a copy of your letter of February 18, 1994, signed on the second page by my client Miguel Lucas. Please let me hear from you as soon as possible concerning my recent proposal to resolve this matter as to Miguel Lucas.

At the June 23, 1994, hearing, SSD submitted an Answer to the Trustee's Objection, and on July 13, 1994, subsequent to the hearing, filed a Supplement. Through these pleadings as well as statements at the hearing, John J. Dilenschneider and Phillip

Lehmkuhl explain their actions regarding the dual representation of the Committee and Miguel A. Lucas, as well as inaction regarding their failure to bring this dual representation to the attention of the Court prior to the instant compensation request.

According to Mr. Dilenschneider, in mid-October 1993, SSD was contacted by Mr. Lucas and other investors subsequent to the bankruptcy filing. Based upon information supplied by Mr. Lucas, that included additional creditors not scheduled by the Debtor, counsel contacted the United States Trustee with the stated intent of providing a comprehensive list of creditors to aid in the formulation of a representative creditors' committee. Subsequently, on October 25, 1993, Mr. Dilenschneider, Mr. Cooper and Mr. Todd, all of SSD, met with Mr. Lucas and other investors with reference to the formation of an investor-creditor committee. At the June 23, 1994, hearing, the Court learned Mr. Lucas was a close personal acquaintance of Mr. Wolfe, his wife was an employee of the Debtor, he was one of the initial investors, and served as a group leader.

Mr. Dilenschneider stated that it was at the October 25, 1993, meeting that he and Mr. Cooper told Mr. Lucas that because SSD was contemplating serving as counsel for a creditors' committee to be formed, they could not represent Mr. Lucas personally, "... in connection with the National case in the bankruptcy court." *SSD Answer, p. 3.* Apparently, Mr. Lucas had already been contacted by the SEC to provide information. After the Committee was formed by the United States Trustee, SSD was selected to serve as counsel on November 8, 1993. Subsequently, the retention application and affidavit detailed above were filed on November 9, 1993.

The Court has learned, however, that on October 27, 1993, Mr. Lehmkuhl, an SSD attorney, met with Mr. Lucas for the first time, reviewed Mr. Lucas' records, and accompanied him to the Courthouse to advise the SEC that Mr. Lucas would not voluntarily provide testimony in part due to Mr. Lehmkuhl's recent retention as counsel. *SSD Answer, p. 3.* The Court has also

learned that on November 5, 1993, Mr. Todd, an SSD attorney, opened a file for Mr. Lucas on behalf of SSD. *SSD Affidavit to Supplement, p. 2.* Mr. Dilenschneider stated that it was not until March 14, 1994, that he and Mr. Cooper became aware of the representation of Mr. Lucas by other SSD attorneys. *SSD Affidavit to Supplement, p. 3.* Apparently, the dual representation was brought to Mr. Cooper's attention by a representative of the United States Trustee who received a copy of Mr. Lehmkuhl's March 1994 letter to the SEC. Mr. Dilenschneider determined that rather than amending the retention affidavit, he would detail the dual representation in his fee application because SSD had already terminated its representation of Mr. Lucas, and because the role of the Committee would be completed upon the contemplated agreed appointment of a chapter 11 trustee in the near future. *SSD Affidavit to Supplement, p. 3.*

The Supplement is particularly interesting in its provision of internal memoranda. These memoranda *(Exhibits B and C to Supplement)* tend to support Mr. Dilenschneider's assertion that at least he and Mr. Cooper did not know of the dual representation at the time they filed the retention papers. Prior to the filing of the retention papers, apparently, Mr. Dilenschneider knew only that Mr. Lehmkuhl asked the SEC for additional time to respond to questions as a "... courtesy to Mr. Lucas until he could find an attorney." *Affidavit to Supplement, p. 2.* Mr. Todd of SSD, however, knew of the representation since he opened the file to represent Mr. Lucas on November 5, 1993. *Affidavit to Supplement, p. 2.* Mr. Todd appeared before this Court and the United States District Court on behalf of the Committee and billed the estate for 175.60 hours of legal services at the rate of $200.00 per hour, which is the second highest number of hours billed.

Further, it is evident that at least one attorney at SSD, Mr. Cooper, was of the opinion that the prompt filing of an amended affidavit would be appropriate after the discovery of the dual representation in March 1994. *Exhibit B to Supplement.* Apparently, however, this advice was not followed, in part, based upon Mr. Dilenschneider's ex-

pressed belief and conclusion that SSD's dual representation did not render it nondisinterested. *Exhibit C to Supplement.*

If counsel at SSD offered the Supplement for exculpatory purposes, they must be disappointed. Indeed, at best it paints a picture of ineptitude with the proverbial right hand not knowing what the left is doing, which is inexcusable given the high profile of the National Liquidators case in this legal community and the fact that a simple discussion among SSD counsel projected to work on the case would have revealed the simultaneous representation of Mr. Lucas. At worst, it demonstrates a level of arrogance regarding the efficacy and appropriate timing for disclosure of information to the Court. Apparently, counsel thought as long as they concluded there was no problem there was no need to mention it to the Court at the time of discovery. The court in the case of *In re Chou–Chen Chemicals, Inc.,* 31 B.R. 842, 851–853 (Bankr.W.D.Ky.1983), ably expressed the significance of timely, complete, and accurate disclosure:

> ... (T)he American system (compared to Civil law systems based upon an inquisitorial process) is one of adversarial justice, in which courts make clear and comparatively simple choices between conflicting claims. The adversary system requires as a minimum condition a clear identification of the parties to a dispute.
>
> ... (T)he conflict of interest rule is a necessary adjunct to the adversarial method and therefore to the justice system itself, in that it defines and protects the boundaries of competing interests within the framework of any given litigation. *Proper judicial perspective may be gained only by knowing exactly where those boundaries lie.*
>
> ... *If a lawyer holds himself out as representing one party, but in reality represents another, either in addition to or instead of his stated retainer, that lawyer distorts the judicial perspective. As officers of the Court, lawyers frame issues and contend for results only as they might affect known interests. Judges direct their thinking and frame their decision along the lines presented to them, the only lines*

*they are allowed to know. If a conflict of interest exists a court decision may impact in an unintended way or touch a party not meant to be reached by the judicial hand.... Judicial error, not necessarily correctable, can be created out of mistaken identity and the confusion of interests....* To the extent, then, that the conflict-of-interest rule forms an integral component of the judicial function, we must address it directly where it appears. *In re Chou–Chen Chemicals, Inc.,* 31 B.R. 842, 851–853 (Bankr.W.D.Ky.1983) (emphasis added).

Also, the Court is dismayed that the United States Trustee, who became aware of the dual representation apparently as early as March 1994, never acted directly to bring it to the attention of the Court. This frustration is only fueled by the statement of a representative of the United States Trustee at the hearing that no position was being taken. Apparently, the United States Trustee, aware of the issues, deferred to the chapter 11 Trustee the responsibility of bringing them to the attention of the Court.

If the United States Trustee does not have a position on a matter so significant to this case and to the integrity of the system in general, it is hard to imagine what circumstances would lead it to take a position. While the Court recognizes that the United States Trustee has discretion to determine how it should perform its statutory obligations and utilize its limited resources, including monitoring the retention and compensation of professionals and creditors' committees, the exercise of this discretion is not without responsibility and potential detriment to the credibility and continued viability of the United States Trustee program. A balance between overkill and reticence must be struck with the recognition that those voicing the strongest opposition to the role of the United States Trustee are often the same parties that require the greatest scrutiny.

The United States Trustee has no economic interest, and neither wins nor loses. Accordingly, it is often the only entity available to raise the difficult issues, and is a welcomed resource for the Court. The United States Trustee by statute is an active participant in the process. It should govern itself accordingly and not defer action to parties. All too often, the parties, with this case being a refreshing exception, for economic reasons or for the reason that they might find themselves on the other side in the future, fail to raise matters of disqualification. Also, excluding the instant case, at times parties raise disqualification issues merely for strategic advantage.

These comments are not meant as a condemnation but rather as constructive comment. Indeed, the efforts of the United States Trustee in filing the Motion to Convert, obtaining the appointment of a trustee, selecting an examiner and a trustee have all been commendable and of significant benefit to the estate. On the theory that it is important on occasion to verbalize the obvious and to express the things we take as a given, the United States Trustee must continue to serve as the vanguard, especially on those issues that impact upon the integrity of the process.

Counsel at SSD justifies its actions or inaction on the theory that they never represented Mr. Lucas in the bankruptcy case, and that he was merely called as a potential witness by the SEC and has not been named as a defendant in any SEC action or other proceeding related to the Debtor. The web of distinction that counsel weaves, however, is so fine that it is almost imperceptible, and is so flimsy that it is useless as support for the weight of their argument. Indeed, counsel is "hoist with his own petar," as one of the more illuminating excerpts from the transcript of the June 23, 1994, hearing demonstrates:

*Court:* What did you do for Mr. Lucas?

*Mr. Lehmkuhl:* Aside from meeting with him discussing the history of his involvement with National Liquidators and counseling him with respect to testifying before the SEC and its ramifications, nothing.

*Court:* Was Mr. Lucas one of the initial investors?

*Mr. Lehmkuhl:* I cannot say, your Honor, again realizing of course the restrictions I am under as to client confidentiality.

*Court:* Which client?

*Transcript, pp. 39–40.*

■ Creditors' committees play a pivotal role in the chapter 11 process. Like debtors, they also serve as fiduciaries and are required to act in a manner to serve the best interest of the estate and its creditors. 11 U.S.C. § 1103(c)(5). As such, committees and their counsel do not act in the best interests of their individual members but must serve to protect the interests of all creditors. *In re Mesta Machine Company,* 67 B.R. 151, 156–158 (Bankr.W.D.Pa.1986).

In this endeavor, committees have substantial powers, including but not limited to the retention of professionals payable from estate assets. 11 U.S.C. § 1103(a) and (b). Such professionals cannot simultaneously represent parties having adverse interests; however, the mere representation of creditors does not per se constitute an adverse interest. 11 U.S.C. § 1103(b).

In order for the Court to determine whether proposed committee professionals represent an adverse interest, it is incumbent upon the party seeking retention to disclose all known connections with the debtor, creditors, and any other parties. FRBP 2014(a), LBR 4.3(c). The penalty, where committee professionals either are or become during the course of the case holders of an adverse interest, is the denial of compensation for services and expenses. 11 U.S.C. § 328(c).

■ It is hornbook bankruptcy procedure that professional retention must be based upon careful review and full disclosure by the prospective professionals, and that the prospective professionals must be free of any personal interests or connections that are at odds with the interests of the entities they intend to represent. *See In re Carrousel Motels, Inc.,* 97 B.R. 898, 900 (Bankr. S.D.Ohio 1989); *In re Lee Way Holding Co.,* 102 B.R. 616, 624 (D.S.D.Ohio 1988); *In re Lee Way Holding Co.,* 100 B.R. 950, 955–62 (Bankr.S.D.Ohio 1989); *In re F & C International, Inc.,* 159 B.R. 220, 222–24 (Bankr.S.D. Ohio 1993); *In re Tri Mfg. & Sales Co.,* 51 B.R. 178, 179–80 (Bankr.S.D.Ohio 1985). *In re Chou–Chen Chemicals, Inc.,* at 851–853; *In re Kendavis Industries Intern., Inc.,* 91 B.R. 742, 751–54 (Bankr.N.D.Tex.1988).

■ In the instant case, the Court concludes the disclosure was abysmal in terms of its initial lack of information and in terms of counsel's failure to supplement the record at the earliest opportunity. While Mr. Dilenschneider and Mr. Cooper apparently did not know of the dual representation until March 1994, Mr. Todd, who was extremely active in the case, knew on November 5, 1993, four days prior to the filing of the retention papers. After March 1994, no attempt was made to amend the retention papers that served as the basis for the appointment of SSD.

■ The Court also concludes that SSD represented an adverse interest in its simultaneous service as counsel for Mr. Lucas and the Committee. First, Mr. Lucas was a close acquaintance of Mr. Wolfe, was one of the initial investors, served as a group leader, and his wife served as an employee for the Debtor. It should have been obvious to counsel that they could not ethically and effectively represent both the Debtor and Mr. Lucas. *See,* O.R.C.Ann. title 19, Canon 5; DR 5–105(A), (B), (C), (D); EC5–15; O.R.C.Ann. title 19, Canon 4.

There were statutory clues everywhere; i.e., Mr. Lucas as a potential preference defendant or a potential fraudulent conveyance defendant. The very questions that the SEC intended to ask Mr. Lucas, as detailed in their correspondence quoted above, should have been foremost on the minds of Committee counsel. One of the key functions of committees is to, "... investigate the acts, conduct, assets, liabilities, and financial condition of the debtor...." 11 U.S.C. § 1103(c)(2). It is not uncommon for creditors' committees to pursue fraudulent conveyance or preference litigation in lieu of debtors where all hope of reorganization is lost or debtors are unable or unwilling to take action. The Court cannot fathom how SSD could make the requisite inquiries and take action without violating the confidences and privileges associated with representing both of their clients.

The fears and conclusions of the Court are in no measure assuaged or altered by counsel's argument that Mr. Lucas has not yet been named as a defendant, that SSD no

longer represents Mr. Lucas, and the Committee is now inactive with the appointment of the Trustee. The Court was always concerned with the lack of progress in this case; i.e., some level of cooperation between the Committee and the SEC with reference to the pursuit of causes of action to pay creditors. It has always been the view of the Court that the SEC action in United States District Court and the bankruptcy case had the same purpose and end result of hopefully returning some funds to creditors. The Court did not understand at the time why there was not more cooperation and progress on this front, but can now understand why the SEC may have been reluctant to cooperate with the Committee and its counsel. The obvious questions would be, who are we cooperating with, the Committee or Mr. Lucas, and who would we be allowing to intervene, the Committee or Mr. Lucas?

This case was filed as an involuntary under a great cloud of suspicion as to the disposition of substantial funds; even the principal of the Debtor initially could not be found. This Court cannot help but believe that the administration of this case would have been enhanced by Committee counsel who had no connections whatsoever with parties that were real or potential targets in any future recovery actions. How could any creditor, law enforcement agency, or any other party have any confidence in the independence of the actions of the Committee where its counsel actively represents a member of the Committee who is being asked questions by the SEC that indeed Committee counsel must ask and ultimately pursue? *See*, O.R.C.Ann. title 19, Canon 9. We may never know what, if any, discrete harm occurred by the dual representation; however, counsel's action did nothing to alleviate the level of distrust that was present in this case from the beginning.

■ Having concluded that SSD failed to provide adequate disclosure and represented an adverse interest, the Court must decide the appropriate remedy in the context of their compensation. · As noted above, SSD's dual representation presented some obvious difficulties that should have alerted counsel. The warning signs were either not observed or were ignored. In addition, once counsel became aware of the issues as raised by the SEC, it failed to act promptly to supplement its initial disclosures that were grossly inaccurate. The Court also concludes that counsel's dual representation reduced its efficacy as counsel to the Committee, contributed to the overall suspicion of the financial transactions in this case, and serves as a negative reflection upon the bankruptcy system. All of these factors lead the Court to deny all fees and expenses. As the Court expressed at the hearing, if the dual representation had been known, SSD would not have been retained. This decision has the intended result of restoring the state of affairs to where they were had counsel not been employed.

The Court recognizes that its decision may be perceived as harsh. The harm, however, could have been eliminated or minimized had there been timely, complete, and accurate disclosure. To allow any fees or expenses in this instance would render meaningless the disclosure provisions of the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, and serve as *de facto* approval of their disregard.

■ The only matters that cannot be rectified by not awarding fees or expenses are sums that have been or will be expended to compensate the Trustee for this disqualification litigation. Under the circumstances of this case, particularly the initial lack of disclosure and failure to timely supplement the disclosure, the Court deems it appropriate to assess against SSD the fees that have been or will be incurred by the Trustee in this litigation. The Court concludes that it would be unfair to creditors to burden them with this unnecessary expense. Upon filing of a separate fee application and after due notice and opportunity for hearing to SSD, the Court will make an award to be assessed against SSD. 11 U.S.C. § 105(a), FRBP 2014(a) and 9011(a), LBR 4.3(c) and 1.4; *In re Lee Way Holding Co.*, 102 B.R. 616, 625 (D.S.D.Ohio 1988).

The Court trusts that its ruling will serve to emphasize the importance of timely, complete, and accurate disclosure and the need to take every precaution to avoid the acquisition or representation of interests that are at odds with those of debtors and creditors'

828

committees. Above all else, such entities serve as fiduciaries for the benefit of estates and creditors, and accordingly deserve counsel that are unfettered in their efforts to advance the causes of those fiduciaries.

IT IS SO ORDERED.