**In re Gary MERCURY and Mary Mercury, Debtors.**

**No. 99 B 20783(ASH).**

United States Bankruptcy Court, S.D. New York.

May 30, 2002.

Mark S. Swartz, Bardonia, NY, for Debtors.

Alan G. Merkin, P.C., Fellows & Hymowitz, P.C., New City, NY, for Applicant Fellows & Hymowitz, P.C.

William F. MacReery, Katonah, NY, for Chapter 7 Trustee.

## AMENDED DECISION DENYING PROFESSIONAL COMPENSATION

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Before me is an application by the law firm of Fellows & Hymowitz, P.C. ("F & H") for professional compensation (a one-third contingency fee) and reimbursement of expenses in connection with the settlement, on behalf of the debtors' then Chapter 7 Trustee, of a state court personal injury action in which they were counsel of record for debtors Mary and Gary Mercury. The settlement was approved in November 2000 by this Court (Connelly, B.J.) over the bitter objection of both debtors, who then were not represented by counsel. As amplified below, because F & H repudiated its legal and ethical obligation to represent their clients, the debtors, and undertook the conflicting representation of the Chapter 7 Trustee in violation of the New York Code of Professional Responsi-

bility and 11 U.S.C. § 327(a) and (e), the application is denied.

### Findings and Conclusions

A trial hearing on the F & H application was held on January 29, 2002. The evidence was supplemented by later submissions requested by the Court. The following constitute this Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### Jurisdiction

This Court has jurisdiction over the subject matter of this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference signed by Acting Chief Judge Ward dated July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

### Findings of Fact

Mary Mercury was grievously injured[1] in a "slip and fall" accident on an icy sidewalk owned or controlled by a church elementary school in December 1992. Mrs. Mercury's injuries were crippling, precluding her from working and requiring a number of surgeries not all of which have been performed as of this date. She has suffered and continues to experience constant, severe pain.

After another firm commenced the personal injury action in 1996 in which both Mercurys were named plaintiffs, the Mercurys retained attorney Robert Fellows of the F & H law firm to represent them in the action against the owner of the proper-

---

**1.** Robert Fellows, the Mercurys' attorney in their personal injury action, described Mary Mercury's injuries as follows:

... [T]he injuries that Mary sustained which are concededly most serious involved a bimalleolar fracture dislocation of the ankle where the fibula, the small bone at the bottom of the leg, broke together with

what's called the malleolus bone, and there was also a dislocation involving a surgical procedure with the insertion of a—with some pins and some internal fixation devices and there was some residual impairment with regard to the ability to ambulate. It was concededly a very serious injury. (October 19, 2000 Tr. at 11)

ty on which Mary was injured. They signed a retainer agreement with the F & H firm dated June 4, 1998, which provided for a one-third contingency fee.

While Mary Mercury was suffering the personal and economic consequences of her accident, Gary Mercury was experiencing business reverses. Mr. Mercury was and is a 22% minority investor in, and had been president of, real estate developer South Liberty Realty Corporation ("South Liberty"). A dispute between Mr. Mercury and his co-venturers in South Liberty resulted in a state court lawsuit by South Liberty against both Mercurys in 1995. On March 2, 1999 South Liberty obtained a judgment against Mr. Mercury. Although a February 11, 1999 ruling of the state court concluded that "the action against the defendant, Mary Mercury, is dismissed," shortly after the judgment against Mr. Mercury South Liberty somehow obtained a judgment against Mrs. Mercury. Despite Mrs. Mercury's contention that there was no basis for the judgment against her on account of her husband's business activities, South Liberty was threatening to levy execution upon the Mercury home, title to which was held in her name, as well as Mr. Mercury's 22% stock interest in South Liberty.

Faced with this crisis the Mercurys turned to Mrs. Mercury's counsel in the personal injury action, and Mr. Fellows referred them to his partner, Steven Hymowitz, Esq., for bankruptcy advice. The Mercurys reported no substantial source of income at the time. Their assets, other than their home which was subject to first and second mortgages aggregating slightly more than the value of the home, consisted of Mr. Mercury's claims related to his investment in South Liberty (which he valued substantially in excess of the South Liberty judgment against him) and Mrs.

Mercury's personal injury action (which might be successful in an amount far exceeding all their debts, but also might fail either as to liability or damages). Upon these facts Mr. Hymowitz concluded that the Mercurys could not expect to confirm a plan under Chapter 11, and he advised the Mercurys to file for bankruptcy under Chapter 7.

The Mercurys paid Mr. Hymowitz $1,200 but were not asked to sign a retainer agreement with respect to bankruptcy representation. Mr. Hymowitz prepared and filed the petition as if the Mercurys were proceeding *pro se*, without the assistance of counsel.

The petition was filed March 29, 1999. Barbara Balaber–Strauss was appointed interim Trustee and became permanent Trustee on May 11, 1999.

In accordance with the retainer agreement, Mr. Fellows and his firm prosecuted the personal injury action on behalf of the Mercurys. In June 1999 F & H were successful in defeating a motion for summary judgment by the defendant. The case was fully prepared and ready for trial in January 2000, and the state court set January 31, 2000 as the date for picking a jury.

Shortly before January 31, 2000 counsel for the defendant's insurance carrier contacted Mr. Fellows and requested that the parties participate in mediation to settle the case. When so advised by Mr. Fellows, the Mercurys responded that they did not wish to participate in a mediation and wished to proceed promptly to trial. Mr. Fellows assured them that there could be no prejudice to their interests if he and they attended the mediation because, if the outcome of the mediation were not satisfactory to them, they could then proceed to trial.[2] A mediation was held on February

---

**2.** The testimony of both Mercurys on which this finding is based was quite clear. Al-

4 or 18, 2000 (the discrepancy in the evidence as to the date is not material) at which Mr. Fellows and the defendant's insurance carrier reached a settlement figure of $190,000, which Mr. Fellows told the

Mercurys was the best figure that could be obtained. The Mercurys rejected the proposed settlement and made clear to Mr. Fellows their desire to proceed to trial in the personal injury action.[3]

though his testimony at the October 19, 2000 hearing was equivocal, Mr. Fellows acknowledged:

A I think, Gary, that you expressed in a discussion about mediation, I have a recollection that you had some reservations about mediation, you had some reservations about whether you wanted to proceed in that direction. I think we had a discussion that there would not be a downside in attempting to mediate the dispute. (October 19, 2000 Tr. at 20)

At the hearing on January 29, 2002, Mr. Fellows testified in connection with his advice to the Mercurys concerning the mediation process:

Q Was there any discussion as to their [the Mercurys'] rights to proceed to trial? A I always told them that they had the right to trial.... (January 29, 2002 Tr. at 104)

Mr. Fellows testified that he advised the Mercurys that "there was no real down side to mediate" (*id.* at 120) and "I indicated to them that a mediation session was a session which was not binding; that it would not result in the resolution of their matter" (*id.* at 121). Mr. Fellows testified:

THE COURT: Were you aware prior to the mediation that the Mercury's [sic] wanted to go forward and have a trial and Ms. Mercury wanted to have her day in Court with regard to her injuries?

THE WITNESS: I believe that they certainly, as any client, wanted their day in Court if the mediation did not bear fruit.

\* \* \* \* \* \*

THE COURT: Did you tell the Mercury's [sic] that if they went to mediation that they might be forced to settle against their will?

THE WITNESS: No, not to my knowledge.

THE COURT: Did you tell the Mercury's [sic] that there was no down side to mediation because if an agreement were not reached to mediate they could proceed to trial?

THE WITNESS: I believe that I did inform them that if mediation did not bear fruit, if you will, and was not successful, they retained the option of going forward

with the understanding that the decisions in that regard were decisions of the trustee and the attorney and not of myself.

THE COURT: But you never told them that they had no voice in the matter and that they could be forced to settle against their will or did you?

THE WITNESS: At the mediation session?

THE COURT: Before the mediation?

THE WITNESS: No. I have no recollection of saying that to them.

(*Id.* at 122–124)

**3.** This finding of fact is based upon the testimony of both Gary and Mary Mercury, which I find quite credible on this point and consistent with the evidence. Mr. Fellows' testimony, while vacillating, makes clear that the Mercurys did not accept the $190,000 settlement figure reached at the mediation.

THE COURT: And did there come a time on that day on February 4th when you were given a settlement proposal of $190,000.00?

THE WITNESS: Yes.

THE COURT: And did you take that settlement proposal and explain it or commend it or report on it to the Mercury's [sic]?

THE WITNESS: Sure.

THE COURT: Privately?

THE WITNESS: Yes.

THE COURT: Just the three of you?

THE WITNESS: Yes.

THE COURT: What was their response?

THE WITNESS: Their response was that they did not believe—part of my recollection, this is the best that I can recall, Judge—they had some reservations about whether that sum reflected fully what they believed the damages were in their case; that they had some concern about whether it was an adequate amount: that they were going to think about it and they were going to consider it and that's as best as I can recall.

THE COURT: They didn't reject it then and there?

THE WITNESS: No, no, they had serious reservations about it. Thinking about

But the action did not proceed to trial. After the mediation Mr. Fellows had no further communication with Gary or Mary Mercury concerning the proposed settlement. (January 29, 2002 Tr. at 107–108)

Beginning in January Mr. Fellows had conversations with the Chapter 7 Trustee and her counsel concerning retention of F & H as special counsel to the Trustee. Mr. Fellows wrote letters to the Trustee and her counsel dated January 26 and 28, 2000, respectively, and his affidavit in support of his retention as special counsel to the Trustee is dated January 28, 2000. By application dated April 6, 2000, counsel for the Chapter 7 Trustee sought an order retaining F & H as special counsel to the Trustee (the "special counsel retention motion"). The special counsel retention motion was delivered to the Office of the United States Trustee for review and approval, but was never served on Mr. and Mrs. Mercury or any other party. The motion did not disclose any actual or potential conflict between the Mercurys and the Chapter 7 Trustee with respect to the potential settlement. Unbeknownst to the Mercurys, unopposed by any other party, and approved by the office of the United States Trustee, the special counsel retention motion was granted by this Court's order dated May 2, 2000. Shortly following the order approving retention of his firm as counsel to the Chapter 7 Trustee, Mr. Fellows wrote a letter dated May 17, 2000 to Mr. and Mrs. Mercury (quoted in full under point II, below) advising them for the first time that their interests were adverse to those of the Trustee and that they should retain counsel to represent them.[4]

it, going back in time and visualizing as I'm speaking to you now, images come into your mind and I can report to you, Judge, that they didn't have a positive reaction about it. They were concerned about it. They didn't embrace the offer. They had reservations and concerns about it. If you want to characterize those as objections, one could reasonably characterize their response as an objection to the offer as to the evaluation of the offer was inadequate. Yes, to that extent that's my recommendation [sic—"recollection"?]. It wasn't a circumstance where Gary or Mr. & Mrs. Mercury indicated "This sounds like an excellent offer."

THE COURT: Would any intelligent person watching the conversation among the three of you have concluded that the Mercury's [sic] reaction to your proposal or the proposal that had been given to you to settle for $190,000.00 was, "No, we don't want to do that"?

THE WITNESS: Yes, I think a reasonable person might think that and make that inference that they had some reservations about it.
(*Id.* at 132–133)

4. Prior to the May 17, 2000 letter, Mr. Fellows never advised the Mercurys that there was any actual or potential conflict between their interests and the interests of the Chapter 7 Trustee, nor did he advise them that he planned to represent the Trustee. He testified at the January 29, 2002 hearing:

Q My question is did you tell the Mercury's [sic] at some point that the personal injury case could be settled without the Mercury's [sic] consent so long as the trustee consents?
A I don't remember specifically that specific language.

\* \* \* \* \* \*

Q And did you indicate to them that you planned on representing the trustee in this case?
A I can't specifically recall that. That I had indicated at what point in time?
Q At any point in time prior to the mediation?
A Did I ask them—
Q That you told the Mercury's [sic]. "I'm going to go down to this mediation, Gary and Mary, but when I'm there I'm going to be representing the bankruptcy trustee and not representing you"?
A I never had that conversation with them.
(*Id.* at 114)

THE COURT: At what point did you become aware that there was a conflict between your role as counsel for the Mercu-

At no time did Mr. Fellows or F & H ever apply either to the state court or to this Court to be relieved of their contractual and professional obligation to represent the Mercurys in the personal injury action pending in the state court, nor were they ever relieved of that obligation.

But F & H did make a motion, *ex parte*, to withdraw as counsel in the bankruptcy case. Although F & H had been unwilling to make a formal appearance as counsel for the Mercurys in their Chapter 7 case, in fact the firm accepted a retainer of $1,200 and acted as the Mercurys' bankruptcy counsel in rendering pre-petition counseling and advice, preparation of the petition and schedules and continuing actual representation of the Mercurys in the usual and customary proceedings in a Chapter 7 case, including the Section 341(a) meeting, disclosure and the like. Prior to the filing of the special counsel retention motion by the Chapter 7 Trustee, F & H filed its own motion by notice dated January 25, 2000 in the Bankruptcy Court seeking to withdraw as counsel for the debtors in the Chapter 7 case (the "Chapter 7 withdrawal motion"). Like the special counsel retention motion, the Chapter 7 withdrawal motion was never served on Mr. and Mrs. Mercury. Unbeknownst to the Mercurys [5] and unopposed by any party, the Chapter 7 withdrawal motion

ry's [sic] and your prospective role as counsel for the Chapter 7 trustee in arguing on behalf of the settlement which your clients had rejected?

THE WITNESS: I was never aware that I was in any conflict situation in the first instance, Judge.

THE COURT: You never became aware of that?

THE WITNESS: I never became aware or never perceived myself of doing anything other than what was approved by the trustee and what I felt was in the best interests—

THE COURT: That's not quite my question. My question is at what point did you come to the perception that there was a conflict between your duty as attorney for the Mercury's [sic]—if you did come to such a point, maybe you never did. The question is did you come to a point where you perceived that there was a conflict between your duty as attorney for the Mercury's [sic] and your duty as attorney, either prospectively or after you had been retained, your duty as an attorney for the Chapter 7 trustee arguing in behalf of a settlement that your clients, the Mercury's [sic], had rejected?

THE WITNESS: When I was approved— when I was informed that I was now approved as the attorney for the trustee then, obviously, I would be in a conflict position but before the approval as attorney, I perceived myself as acting in a way that was designed to try to get their case resolved. (*Id.* at 138–139)

THE COURT: What about the down side of parties that basically did not want to settle and wanted to go to trial being forced as a consequence of a mediation to settle? Was that a down side that you considered with your client, the Mercury's [sic]?

THE WITNESS: Give me that again, Judge? I'm sorry.

THE COURT: Was it a down side that you considered with your clients, the Mercury's [sic], that a mediation could result in a settlement proposal that could be thrust down their throats?

THE WITNESS: I didn't consider that as a down side. I didn't consider that at all. I considered that the decision on their case was one that rested with Mr. McCreary [sic].

THE COURT: I see. So you did not advise them of that down side?

THE WITNESS: That a settlement could be forced down their throats?

THE COURT: Yes.

THE WITNESS: I never told them that a settlement could be forced down their throat. I told them that decisions on the matter rested with the trustee. (*Id.* at 128–129)

5. Mr. Mercury testified at the September 20, 2001 hearing: "... then Mr. Hymowitz withdrew from the case in March of this year. I did not even know that he was withdrawing." (September 20, 2001 Tr. at 12)

was granted by this Court's order dated March 3, 2000.

Thus it was that by May 2000 the Mercurys were effectively deprived of any counsel to represent them either in the Bankruptcy Court or in the personal injury action, by reason of two motions in the Bankruptcy Court, neither of which was served upon them, combined with Mr. Fellows' letter dated May 17, 2000 notifying the Mercurys of their conflict with the Chapter 7 Trustee and the necessity for them to retain new counsel—notwithstanding the fact that F & H were never relieved by consent of the Mercurys or by any court of their duty to represent the Mercurys under their retainer agreement.

By scheduling order dated June 6, 2000 the Chapter 7 Trustee moved for an order authorizing settlement of the Mercurys' personal injury action for $190,000. The scheduling order required service of the order and the motion by June 19 and set July 18, 2000 as the date for a hearing.

The June 6 scheduling order provided for service of the motion to approve the settlement on the Mercurys and also on "their attorney," identified as Kenneth J. Murphy, Esq. In fact, the Mercurys had no counsel to represent them as of June 6, 2000 or thereafter. It appears that Mr. Murphy, a personal friend of Gary Mercury, had rendered some legal assistance to the Mercurys in connection with their Chapter 7 case after Mr. Hymowitz told them in December 1999 that he would no longer represent them as bankruptcy counsel. But Mr. Murphy did not agree to represent the Mercurys and did not appear as attorney of record on their behalf in any proceeding. Mr. Murphy rendered no assistance to them after the June 6 scheduling order (or indeed for some time

prior thereto) and this fact was known to Mr. Fellows, the Chapter 7 Trustee and her counsel.

Mr. and Mrs. Mercury appeared at the July 18, 2000 hearing *pro se* to oppose the Chapter 7 Trustee's motion to approve the $190,000 settlement. Believing that the Mercurys should be represented by counsel, Judge Connelly adjourned the hearing to August 22, and from that date to September 20, 2000.[6] Although the Mercurys had been in consultation with a well-known bankruptcy attorney, Lawrence Reich of Reich, Reich & Reich, Mr. Reich had not then agreed to represent them and Judge Connelly again adjourned the hearing, to October 19, 2000 in order to give the Mercurys a further and final opportunity to retain counsel.

At the October 19 hearing the Mercurys again appeared *pro se*. The following dialogue occurred at the October 19 hearing:

THE COURT: The last we were here some time ago and I adjourned this matter to today to give you an opportunity to gain the services of Mr. Reich. Have you done so?

\* \* \* \* \* \*

MR. MERCURY: They said they would represent me as long as they know how they were going to be paid.

THE COURT: And have you made arrangements with him?

MR. MERCURY: And I should come to this Court and try and appeal to have this converted to a Chapter 11 so this way they could do the following items along with Mr. Sickle on my behalf. (October 19, 2000 Tr. at 4–5) The Chapter 7 Trustee's counsel objected to conversion, stating, in part: "Mr. Mercury's sugges-

---

**6.** There is no transcript of any hearing on August 22, and it appears that there was no hearing on that date.

tion for a conversion to a Chapter 11 and to have the Reich and Reich firm proceed with a Chapter 11 takes the issue [sic] as well because there's nothing which would support economically this case in a Chapter 11." (*Id.* at 6) Judge Connelly then asked "does not a person have a right to convert a case from one section of the code to the other?" (*Id.*) The Chapter 7 Trustee and her counsel both responded to the Court's question. The Trustee stated:

> There's a statutory provision for that that on motion they can in fact convert a case. I would point out, Your Honor, that generally it's done on motion and that the only way that a debtor stays in a Chapter 11 is in fact if there is a funding for the Chapter 11. And since this debtor has shown no income … [i]t would seem to me that this could not succeed in a Chapter 11. (*Id.* at 7)

The Trustee's counsel then made the following representation to the Court:

> And as a matter of fact, Your Honor, there is some authority which says particularly, even in Chapter 13's but more generally in 11's, any motion to convert the case must be made—to an 11, must be made in good faith with some feasibility as opposed to merely wasting the Court's and creditors' time. (*Id.*)

These arguments obviously persuaded the Court, because Judge Connelly immediately said "Call your witness with respect to the reasonableness of the settlement" (*id.*), and there was no further mention of conversion to Chapter 11.[7]

The balance of the October 19, 2000 hearing consisted of the testimony on direct examination of Mr. Fellows in support of the proposed $190,000 settlement and cross-examination of Fellows by Mr. Mercury *pro se.* At the conclusion of the

hearing, Judge Connelly stated his intention to grant the motion and approve the settlement. However, still concerned with the Mercurys' lack of counsel, Judge Connelly withheld docketing of an order for twenty days, stating on the record "Be advised that you [the Mercurys] have to have counsel and something has to be done in the next twenty days" (*id.* at 40). The Mercurys were not able to obtain counsel, and the order approving the $190,000 settlement was dated November 13 and docketed November 14, 2000.

### Wisdom of the Settlement not at Issue

Before turning to a discussion of the relevant principles of law and professional ethics, it is important to make clear what is, and is not, at issue on the motion which is now before this Court.

There is no question that Mr. Fellows and the Chapter 7 Trustee and her counsel believed that the $190,000 settlement was advisable from the perspective of the debtors' Chapter 7 estates. The settlement would quite likely have resulted in a dividend to creditors after full payment of commission, fees and disbursements to the Chapter 7 Trustee, counsel and special counsel. Of course, trial of the personal injury action might have brought a far greater recovery for the plaintiffs, even a substantial distribution to the Mercurys; but it might also have resulted in a defendant's verdict, either on liability or damages, in which case the debtors' estates would have been administratively insolvent and even the Trustee and her counsel might have recovered nothing.

It is equally clear that the Mercurys were bitterly opposed to the settlement from the beginning, because it was patently contrary to their interests. Under New York law, Mary Mercury would be entitled

---

**7.** *See* the discussion below concerning a debtor's non-waivable right under 11 U.S.C. § 706(a) to convert from Chapter 7 to Chapter 11.

to receive only $7,500 as an exemption.[8] The balance of the $190,000 would go to full payment of the Chapter 7 Trustee's commissions and the fees and expenses of her two sets of counsel, with the remainder to creditors. It was Mary Mercury primarily, and Gary Mercury secondarily, who suffered the shattering physical and economic consequences of her accident, including the prospect of further surgery, and it was simply unthinkable that they or any lawyer acting on their behalf would have regarded this settlement as acceptable from their point of view.

But the merits of the settlement were litigated in the Chapter 7 Trustee's motion to approve which concluded with the October 19, 2000 hearing and the November 13, 2000 order approving the settlement. Judge Connelly granted the Mercurys almost four months to retain counsel to assist them in opposing the Trustee's motion, but they were unable to do so without conversion of the case to Chapter 11, and they did not have counsel to rebut the arguments of the Trustee and her counsel in opposition to conversion. The chose in action represented by the personal injury action was property of the debtors' estate, subject to the control of the Chapter 7 Trustee and her counsel, and Judge Connelly had no alternative but to decide the motion on the record which was before him. In the vernacular, the settlement is water over the dam, and the merits of the

arguments pro and con are not before the Court on this motion.

The issue before the Court on this motion is whether F & H is entitled to an award of fees and disbursements under the relevant principles of law and professional ethics. To these we now turn.

### Discussion

## I. Relevant principles of law and ethics

### A. Rules governing the attorney-client relationship

#### 1. The duty to represent a client competently and zealously

One of the cornerstones of the judicial process is the adversary system. Whether the issue turns upon finding the facts or discerning or developing the applicable rule of law, the adversary system depends for its efficacy on the competent and zealous representation of each side of the controversy by counsel. These values are recognized in Canons 6 and 7 of The Lawyer's Code of Professional Responsibility adopted by the New York State Bar Association.[9]

Canon 6 of the Code states that "A Lawyer Should Represent a Client Competently." The fundamental duty of competence is amplified in the Ethical Considerations ("EC") under Canon 6. EC 6–1 states in the first sentence: "Because of the lawyer's vital role in the legal process, the lawyer should act with competence and

---

8. New York Debtor and Creditor Law § 282(3)(iii). It should be noted that subsection (iv) of Section 282(3) grants a bankruptcy exemption for

 (iv) a payment in compensation of loss of future earnings of the debtor or an individual of whom the debtor is or was a dependent, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor.

Obviously it would have benefitted Mrs. Mercury to structure as large a portion of the

settlement as might be credible as "a payment in compensation of loss of future earnings" which would have been exempt from her creditors under subsection (iv), but this statutory entitlement evidently was not disclosed to the Mercurys by F & H before, during or after the mediation.

9. The Code of Professional Responsibility is published at Part 1200 of Title 22 of the New York Codes, Rules and Regulations (NYCRR).

proper care in representing clients." EC 6–4 states: "Having undertaken representation, a lawyer should use proper care to safeguard the interests of the client." EC 6–3 states, in part, "Proper preparation and representation may require the association by the lawyer of professionals in other disciplines." Disciplinary Rule ("DR") 6–101, entitled "Failing to Act Competently," provides:

A. A lawyer shall not:

1. Handle a legal matter which the lawyer knows or should know that he or she is not competent to handle, without associating with a lawyer who is competent to handle it.

2. Handle a legal matter without preparation adequate in the circumstances.

3. Neglect a legal matter entrusted to the lawyer.

Canon 7 provides: "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law." EC 7–1 provides:

**EC 7–1** The duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, which includes Disciplinary Rules and enforceable professional regulations. The professional responsibility of a lawyer derives from membership in a profession which has the duty of assisting members of the public to secure and protect available legal rights and benefits. In our government of laws and not of individuals, each member of our society is entitled to have his or her conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense.

Under the heading "Duty of the Lawyer to a Client." EC 7–4 states that "The advocate may urge any permissible construc-

tion of the law favorable to the client, without regard to the lawyer's professional opinion as to the likelihood that the construction will ultimately prevail." EC 7–5 states in the second sentence:

The lawyer may continue in the representation of the client even though the client has elected to pursue a course of conduct contrary to the advice of the lawyer so long as the lawyer does not thereby knowingly assist the client to engage in illegal conduct or to take a frivolous legal position.

EC 7–9 states:

**EC 7–9** In the exercise of the lawyer's professional judgment on those decisions which are for the lawyer's determination in the handling of a legal matter, *a lawyer should always act in a manner consistent with the best interests of the client. . . .* (emphasis supplied)

Finally, DR 7–101, entitled "Representing a Client Zealously," provides unequivocally:

A. A lawyer *shall not* intentionally:

1. *Fail to seek the lawful objectives of the client* through reasonably available means permitted by law and the Disciplinary Rules, . . . .

2. *Fail to carry out a contract of employment entered into with a client for professional services,* . . . . (emphasis supplied)

 Similar precepts may be found in countless New York decisions. For example: "[A]n attorney must carry out a contract for professional services and not to prejudice his client during the course of the representation." *In re Grant,* 14 B.R. 567, 569 (Bankr.S.D.N.Y.1981). "Debtors have the right when they retain an attorney to represent them to receive the guidance, counsel, and support for which they pay." *In re Wright,* 48 B.R. 172, 174

(Bankr.E.D.N.C.1985) (quoted in *In re Ostas,* 158 B.R. 312, 324–25 (N.D.N.Y.1993)).

It is a long-standing precept of the legal profession that an attorney is duty bound to pursue his client's interests diligently and vigorously within the limits of the law (Code of Professional Responsibility, canon 7). For this reason, a lawyer may not undertake representation where his independent professional judgment is likely to be impaired by extraneous considerations. Thus, attorneys historically have been strictly forbidden from placing themselves in a position where they must advance, or even appear to advance, conflicting interests.

*Greene v. Greene,* 47 N.Y.2d 447, 451, 418 N.Y.S.2d 379, 391 N.E.2d 1355 (1979). *See also In re Becker,* 271 A.D.2d 4, 708 N.Y.S.2d 286 (1st Dep't 2000) (attorney "intentionally failed to seek the lawful objective of his clients" by failing to disclose material information concerning a real estate deal); *In re Perry,* 194 B.R. 875, 880 (S.D.Cal.1996) (attorney's simultaneous representation of trustee and prospective purchaser of estate assets prevented attorney from effectively discharging his duty to zealously represent the interests of the estate).

### 2. *The client's right to make substantive decisions*

Of particular importance in the context of this case is EC 7–7, which provides:

**EC 7–7** In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions. *But otherwise the authority to make decisions is exclusively that of the client* and, if made within the framework of the law, *such decisions are binding on the lawyer. As typical examples in civil cases, it is for the client to decide whether to accept a settlement offer* or whether to waive the right to plead an affirmative defense.... (emphasis supplied)

Also important is EC 7–8:

**EC 7–8** A lawyer should exert best efforts to ensure that decisions of the client are made only after the client has been informed of relevant considerations. A lawyer ought to initiate this decision-making process if the client does not do so.... In assisting the client to reach a proper decision, it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible.... *In the final analysis, however, the lawyer should always remember that the decision* whether to forego legally available objectives or methods because of non-legal factors *is ultimately for the client and not for the lawyer....* (emphasis supplied)

 Not surprisingly, case law confirms that an attorney cannot settle a case without the authority of his client. *See Leslie v. Van Vranken,* 24 A.D.2d 658, 261 N.Y.S.2d 103 (3d Dep't 1965) (compromise made without client authorization is a nullity and unenforceable).

From the nature of the attorney-client relationship itself, an attorney derives authority to manage the conduct of litigation on behalf of a client, including the authority to make certain procedural and tactical decisions. But that authority is hardly unbounded. Equally rooted in the law is the principle that, without a grant of authority from the client, an attorney cannot compromise or settle a claim.

*Hallock v. State,* 64 N.Y.2d 224, 230, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984) (citations omitted). *See also Sargent v. Bowler,* 273 A.D. 985, 77 N.Y.S.2d 829, 830–31 (3d Dep't 1948) ("It is well settled in the State of New York that an attorney cannot

settle a suit and conclude his client in relation to the subject in litigation without his client's consent. This is especially true when a client refuses in the presence of the Court and the attorney.") (citations omitted).

### 3. *Limitations on withdrawal from representation*

■ A lawyer who has undertaken a professional representation of a client is not at liberty to simply abandon that responsibility. The subject is dealt with in DR 2–110 of the Code, entitled "Withdrawal from Employment." Subsection (A) of DR 2–110 provides:

A. In general.

1. If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a proceeding before the tribunal without its permission.

2. Even when withdrawal is otherwise permitted or required under section DR–2–110(A)(1), (B) or (C), a lawyer shall not withdraw from employment until the lawyer has taken steps to the extent reasonably practicable to avoid foreseeable prejudice to the rights of the client, including giving due notice to the client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled and complying with applicable laws and rules.

3. A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned.

Subsection (B) of DR 2–110, entitled "Mandatory withdrawal," sets forth in four subsections those circumstances in which a lawyer "shall withdraw from employment," provided the lawyer obtains permission from the appropriate tribunal "if required by its rules." Subsection (C) of DR 2–110, entitled "Permissive withdrawal," provides that except as stated in subsection A "a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client," or if any of six subdivisions of subsection C applies.

■ New York State law prohibits a lawyer from withdrawing from representation of a client in a matter pending before a tribunal without permission to withdraw from the tribunal. When withdrawal by an attorney is other than by the signed consent of the party, Section 321(b)(2) of the Civil Practice Law and Rules provides that:

An attorney of record may withdraw or be changed by order of the court in which the action is pending, upon motion on such notice to the client of the withdrawing attorney, to the attorneys of all other parties in the action or, if a party appears without an attorney, to the party.

*See also Hawkins by Hawkins v. Lenox Hill Hosp.*, 138 A.D.2d 572, 573, 526 N.Y.S.2d 153 (2d Dep't 1988) ("Until an attorney of record is discharged by order of the court or by the filing of the consent of the retiring attorney and party in the prescribed form, the attorney represents the party.") (citations omitted); *Moustakas v. Bouloukos*, 112 A.D.2d 981, 983, 492 N.Y.S.2d 793 (2d Dep't 1985) ("Although a client may, as a matter of public policy, discharge an attorney at any time, with or without cause, an attorney of record in an action may only withdraw or be changed or discharged in the manner prescribed by statute.") (citations omitted); *Langrick v. Rowe*, 32 N.Y.S.2d 328 (N.Y.Sup.Ct.1941) ("When an attorney has appeared for a party in a cause or proceeding, both are estopped from denying the existence of the

relationship of attorney and client," and "such authority and representation continue at least until some formal designation of discharge or substitution has been filed").

Finally, local Bankruptcy Rule 2090–1(e) provides that "An attorney who has appeared as attorney of record may withdraw or be replaced only by order of the Court for cause shown." *See also* Rule 1.4 of the Civil Rules of the United States District Court for the Southern and Eastern Districts of New York:

> An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the court and may not withdraw from a case without leave of the court granted by order. Such an order may be granted only upon a showing by affidavit or otherwise or satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar.

#### 4. *Prohibition against representing conflicting interests*

■ One of the cardinal principles of law and ethics is the prohibition against representation of conflicting interests. Canon 5 states: "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." The first ethical consideration states as follows:

> EC 5–1 The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Neither the lawyer's personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute the lawyer's loyalty to the client.

Under the heading "Desires of Third Persons," EC 5–21 states:

> EC 5–21 The obligation of a lawyer to exercise professional judgment solely on behalf of the client requires disregarding the desires of others that might impair the lawyer's free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence. A lawyer subjected to outside pressures should make full disclosure of them to the client; and if the lawyer or the client believes that the effectiveness of the representation has been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of the client.

Several provisions of the Disciplinary Rules are directly relevant to the matter now before this Court.

#### DR 5–105 Conflict of Interest; Simultaneous Representation

A. A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5–105(C).

#### DR 5–106 Settling Similar Claims of Clients.

A. A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against the clients, unless each client has consented after full disclosure of the implications of the aggregate settlement and the advantages and risks involved, including the existence and nature of all the claims involved and the partic-

ipation of each person in the settlement.

**DR 5–108 Conflict of Interest—Former Client.**

A. Except as provided in DR 9–101(B) with respect to current or former government lawyers, a lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure:

1. Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

B. *Governing provisions of the Bankruptcy Code*

Two provisions of the Bankruptcy Code are of particular relevance in the context of this contested matter. One is Section 327, entitled "Employment of professional persons," concerning the requirements for court approval of attorneys and other professionals to represent the Trustee in a case under Chapters 7, 11 or 12, or the debtor-in-possession under Chapter 11. The other is 11 U.S.C. § 706(a), concerning a Chapter 7 debtor's right to convert to Chapter 11, 12 or 13.

1. *Requirements and consequences under Section 327*

a. *Conflicts*

 The ethical requirement that an attorney be free of conflicting interests in representing a client, expressed as a prohibition of any "interest adverse" and, in the obverse, by the word "disinterested," is central to Section 327 of the Code governing retention of professionals to represent a debtor's estate. Subsections (a) and (e) of Section 327 provide, in relevant part:

(a) ... the trustee, with the court's approval, may employ one or more attorneys ... that do not hold or represent an *interest adverse* to the estate, and that are *disinterested* persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

(e) The trustee, with the court's approval, may employ, for a specified special purpose ... an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any *interest adverse* to the debtor or to the estate with respect to the matter on which such attorney is to be employed. (Emphasis supplied)

 These provisions are very clear. Under subsection (a), to be retained to represent the Trustee the attorney must not "represent an interest adverse to the estate" and must be "disinterested," and under subsection (e) an attorney that has represented the debtor may represent the Trustee only if "such attorney does not represent ... any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." Section 101(14) defines a "disinterested person" as one that "(E) does not have an interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor...." As stated in *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987), the "twin requirements of disinterestedness and lack of adversity telescope into what amounts to a single hallmark." Both Section 327(a) and (e) require, at a minimum, that the attorney to be employed by the estate hold no "adverse interest." 3 COLLIER ON BANKRUPTCY ¶ 327.04[a] at 327–60 (Lawrence P. King, et al. eds., 15th ed. rev.2001).

Although "adverse interest" is not defined in the Bankruptcy Code, it has been defined in the case law to mean:

for two or more entities (1) to possess or assert mutually exclusive claims to the same economic interest, thus creating either an actual or potential dispute between the rival claimants as to which, if any, of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) to possess a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities.

*In re Roberts*, 46 B.R. 815, 826–27 (Bankr. D.Utah 1985), *aff'd in part, modified in part, rev'd in part on other grounds* 75 B.R. 402. *See also In re Angelika Films 57th, Inc.*, 227 B.R. 29, 38 (Bankr.S.D.N.Y. 1998), *aff'd*, 246 B.R. 176 (S.D.N.Y.2000); *In re Glenn Electric Sales Corp.*, 89 B.R. 410, 413 (Bankr.D.N.J.1988); *In re Perry*, 194 B.R. 875, 878 (E.D.Cal.1996). This definition extends to the economic and personal interests of an attorney. *In re Red Lion, Inc.*, 166 B.R. 296, 298 (Bankr. S.D.Tex.1994).

"The determination of adverse interest is objective and is concerned with the appearance of impropriety." *In re Angelika Films 57th, Inc.*, 227 B.R. at 38. "Certainly a 'disinterested' person should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." *In re Codesco, Inc.*, 18 B.R. 997, 999 (Bankr. S.D.N.Y.1982).

An actual conflict of interest is "an active competition between two interests, in which one interest can only be served at the expense of the other." *In re BH & P Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J.1989), *remanded on other grounds*, 119 B.R. 35 (D.N.J.1990), *aff'd*, 949 F.2d 1300 (3rd Cir.1991). *TWI Int'l. Inc. v.*

*Vanguard Oil & Service Co.*, 162 B.R. 672 (S.D.N.Y.1994) (disqualification is mandated where there is an actual conflict). "The unsanctioned representation of conflicting interests is one of the most serious sins that a lawyer can commit." *In re Lee*, 94 B.R. 172, 178 (Bankr.C.D.Cal.1988). "Having to divide one's allegiance between two clients is what Section 327 attempts to prevent." *In re Roger J. Au & Son. Inc.*, 101 B.R. 502, 505 (Bankr.N.D.Ohio 1989). Section 327(a) "is plainly concerned with a professional's divided loyalties and ensuring that professionals employed by the estate have no conflicts of interest with the estate." *In re Envirodyne Industries, Inc.*, 150 B.R. 1008, 1016 (Bankr.N.D.Ill.1993).

It is hornbook bankruptcy procedure that professional retention must be based upon careful review and full disclosure by the prospective professionals, and that the prospective professionals must be free of any personal interests or connections that are at odds with the interests of the entities they intend to represent.

*In re Nat'l Liquidators*, 171 B.R. 819, 826 (Bankr.S.D.Ohio 1994), *aff'd in part, rev'd in part*, 182 B.R. 186 (S.D.Ohio 1995). *See also In re River Ranch, Inc.*, 176 B.R. 603, 604 (Bankr.M.D.Fla.1994) ("inescapable" conclusion that Section 327 "was designed to prohibit anyone to act in the role of a professional where the interest of the professional is patently and obviously adverse to the interest of the estate and, of course, also to the interest of a debtor"). "It is fundamental that attorneys may not represent conflicting interests without full disclosure and consent by all parties." *In re Diamond Mortgage Corp. of Illinois*, 135 B.R. 78, 90 (Bankr.N.D.Ill.1990) (citing ABA Model Code of Professional Responsibility DR 5–105; ABA Model Rules of Professional Conduct Rule 1.7; and *Matthew* 6:24). *See also In re XGW Excavat-*

*ing Co.,* 111 B.R. 469, 472 (Bankr.D.N.J. 1990) ("A professional cannot serve two masters").

██ Bankruptcy courts do not have the authority to allow employment of a professional who has a conflict of interest. *In re Federated Dept. Stores, Inc.,* 44 F.3d 1310, 1318 (6th Cir.1995); *In re BBQ Resources, Inc.,* 237 B.R. 639, 642 (Bankr. E.D.Ky.1999); *In re EWC, Inc.,* 138 B.R. 276, 281 (Bankr.W.D.Okla.1992). To condone employment of an attorney who has a conflict of interest to assist the Chapter 7 Trustee in her duties "would erode the confidence of other parties in the administration of that estate to say nothing of public confidence in the administration of justice in bankruptcy courts." *In re Intech Capital Corp.,* 87 B.R. 232, 236 (Bankr.D.Conn.1988). *See, e.g., In re Southern Kitchens, Inc.,* 216 B.R. 819 (Bankr.D.Minn.1998) (where an attorney has an interest adverse to the estate with respect to the matter for which the attorney would be employed, the attorney is prevented from serving as special counsel under Section 327(e)); *In re National Liquidators, Inc.,* 171 B.R. at 826 (law firm represented adverse interest by simultaneously serving as counsel for creditors' committee and committee member); *In re Paolino,* 80 B.R. 341 (Bankr.E.D.Pa.1987) (attorney who joined firm which was opposing plaintiff-debtors in state court action could no longer be employed as trustee of debtors' estate). For a case closely on point, *see In re Rice,* 224 B.R. 464, 470 (Bankr.D.Or.1998) (where dispute as to potential allocation of personal injury suit proceeds placed the debtor and the trustee "in a direct adversarial position," and where debtor and the estate had a "continuing interest in the personal injury claims," debtor's attorney could not represent the trustee in the continuation of the litigation).

**b. *Disclosure***

██ Not surprisingly, courts have repeatedly held that an application to the court for retention of a professional under Section 327 and Bankruptcy Rule 2014(a) must disclose fully and fairly all existing and potential conflicts of interest or lack of disinterestedness on the part of the professional seeking retention. "An attorney submitting to the scrutiny of the bankruptcy court has a responsibility to disclose any potential conflicts of interest of which he knows." *Kagan v. El San Juan Hotel Corp. (In re El San Juan Hotel Corp.),* 149 B.R. 263, 271 (D.P.R.1992), *aff'd,* 7 F.3d 218, 1993 WL 339701 (1st Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 49 (1994). An attorney seeking a fee from a bankruptcy estate has "a fiduciary obligation to the court" to make "complete disclosure of all facts bearing upon their eligibility for such appointment." *In re Thompson,* 54 B.R. 311, 315 (Bankr.N.D.Ohio 1985), *aff'd,* 77 B.R. 113 (N.D.Ohio 1987) (quoting *In re Arlan's Dep't Stores, Inc.,* 615 F.2d 925, 941 (2d Cir.1979) and *In re Futuronics Corp.,* 655 F.2d 463, 469 (2d. Cir.1981)). The disclosure required of a professional seeking to be employed under Section 327 is set forth in Fed.R.Bankr.P.2014(a):

> The application shall state ... to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States

trustee, or any person employed in the office of the United States trustee.

A bankruptcy court in this district has held that:

> "[F]ailure to disclose any fact which may influence the court's decision may result in a later determination that disclosure was inadequate and sanctions should be imposed on the professional. The fact that disclosure was made elsewhere ... is not likely to ameliorate a court's reaction to incomplete disclosure." All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification.

*In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994) (quoting 8 COLLIER ON BANKRUPTCY ¶ 2014.03 (Lawrence P. King et al. eds., 15th ed. rev.1994)) (citations omitted). *See also In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr.S.D.N.Y.1998) ("The existence of an arguable conflict must be disclosed if only to be explained away."); *In re Filene's Basement*, 239 B.R. 845, 849 (Bankr. D.Mass.1999) (failure to be forthcoming with disclosure provides the bankruptcy court with an independent ground for disqualification, without reaching the issue of whether the attorney is disinterested under Section 327); *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr.W.D.Okla.1992) ("Violation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee ar-

rangements were materially adverse to the interests of the estate or were *de minimis*."); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 236 (Bankr.E.D.Cal.1988) ("The disclosures must appear in the application and declaration required by Bankruptcy Rule 2014(a). It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources."); 1 COLLIER ON BANKRUPTCY ¶ 8.05, at 8–60 (Lawrence P. King et. al eds., 15th ed. rev. 2001) ("Professionals may not make unilateral determinations regarding the relevance of particular connections, or that certain connections to the debtor are too insignificant to disclose. All connections must be disclosed.") (footnotes omitted).

 "Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed.R.Bankr.P.2014(a), court-appointed counsel proceed *at their own risk.*" *Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir.1994) (emphasis in original).

> The duty is one of complete disclosure of all facts, and, if the duty is neglected, even innocently, the offender should stand no better than if the duty to disclose had been correctly performed. Literal enforcement of the rule is required to assure its vitality in combating the evils against which it is aimed.

*In re Plaza Hotel Corp.*, 111 B.R. 882, 883 (Bankr.E.D.Cal.1990), *aff'd*, 123 B.R. 466 (9th Cir. BAP 1990). *See also In re Intech Capital Corp.*, 87 B.R. at 234 (law firm holding adverse interest served as debtor's attorney at its own peril, regardless of whether the adverse interest was promptly disclosed); *In re Rusty Jones, Inc.*, 134 B.R. 321, 341 (Bankr.N.D.Ill.1991) ("Generally, noncompliance with § 327 and Rule 2014 leads to forfeiture of compensation, even if valuable services were furnished to

the estate.") [10]

### c. *Consequence of violation*

The consequence of violation of the prohibition of conflicting interests in Section 327 is provided in Section 328(c) and numerous decisions thereunder. Section 328(c) states, in pertinent part, that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 ... if, at any time during such professional person's employment under section 327 ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."

 The case law confirms what the statute expressly provides—that a professional retained to represent the estate under Section 327 may be denied compensation and reimbursement of expenses if he was not disinterested or was burdened by a conflict of interest. "When a law firm is found not to be disinterested, disallowance of fees is appropriate." *In re Grabill Corp.*, 113 B.R. 966, 969 (Bankr.N.D.Ill. 1990), *aff'd*, 135 B.R. 835 (N.D.Ill.1991), *aff'd*, 983 F.2d 773 (7th Cir.1993) (citing *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 266, 61 S.Ct. 493, 496, 85 L.Ed. 820 (1941) and *Wolf v. Weinstein*, 372 U.S. 633, 641, 83 S.Ct. 969, 975, 10 L.Ed.2d 33 (1963)). *See also In re MFlex Corp.*, 172 B.R. 854, 859 (Bankr.W.D.Tex. 1994) ("If an attorney employed to represent the estate holds an undisclosed adverse interest, a court has the power to deny all compensation."); *In re Areaco Inv. Co.*, 152 B.R. 597, 602 (Bankr.E.D.Mo. 1993) (representation of an interest ad-

verse to the estate while employed under Section 327 is cause to deny an attorney's right to receive a fee pursuant to Section 328(c)).

Section 327(a) acts prospectively by telling those professionals who fail to meet the substantive requirements for retention by the estate that they are disqualified from obtaining court approval, which is the prerequisite to such employment. Section 328(c) acts retrospectively by telling those professionals whose retention under § 327(a) was improper or who, during the case, failed to live up to the substantive requirements of § 327(a) on an ongoing basis while working for the estate that they might lose some or all the compensation to which they might otherwise be entitled. *In re Diamond Mortgage Corp. of Illinois*, 135 B.R. at 89. "Thus, it is clear that if counsel ceases to be disinterested at any time during its representation of the debtor, the bankruptcy court may deny **all** compensation and expenses." *In re Angelika Films 57th, Inc.*, 246 B.R. 176 (S.D.N.Y.2000) (emphasis in original). *See also In re Leslie Fay Cos.*, 175 B.R. at 533; *In re Filene's Basement*, 239 B.R. at 849; *In re Perry*, 194 B.R. at 879 (emphasis in original). *E.g., In re Rancourt*, 207 B.R. 338 (Bankr.D.N.H.1997) (failure by attorneys for Chapter 11 debtors-in-possession and individual debtor to disclose diverging interests of clients resulted in reduction in requested compensation); *In re Alcon Corp.*, 168 B.R. 822 (Bankr.D.R.I.1994) (no compensation from estate for attorney who represented the debtor and the debtor's principal where attorney's opposition to Chapter 7 trustee's efforts to recover funds for the estate was motivated by a desire to protect principal's personal liabil-

---

**10.** An attorney who signs a statement required by Rule 2014(a) and fails to disclose potential conflicts of interest may also violate

Fed.R.Bankr.P. 9011. *In re Black Hills Greyhound Racing Ass'n*, 154 B.R. 285, 293 (Bankr.D.S.D.1993).

ity); *In re Intech Capital Corp.*, 87 B.R. 232, 234 (Bankr.D.Conn.1988) (law firm holding adverse interest served as debtor's attorney at its own peril where creditor and creditors' committee challenged firm's application for employment from the outset.); *In re Patterson*, 53 B.R. 366 (Bankr. D.Neb.1985) (law firm which represented debtors-in-possession was not entitled to compensation where law firm had conflict of interest with debtors); *In re Roberts*, 46 B.R. 815 (denying fees to firm where conflicts arose between corporate and individual debtors in their separate bankruptcy cases and each debtor was represented by the same firm).

### 2. *The debtor's right to convert to Chapter 11*

■■■ There is no question that the Mercurys' pre-petition claims asserted in the personal injury action constituted property of the debtors' estates under 11 U.S.C. § 541(a)(1). *See* 5 COLLIER ON BANKRUPTCY ¶ 541.08, at 541–44 (Lawrence P. King et al. eds., 15th ed. rev. 2001); *In re Ballard*, 238 B.R. 610 (Bankr. M.D.La.1999) (holding that settlement funds from a personal injury claim compensating for post-petition loss of earning capacity and medical expenses are property of the bankruptcy estate).

Pursuant to section 323(b), a trustee may intervene as the estate's representative under section 323(a) as plaintiff or defendant in suits pending at the time of the bankruptcy with or without bankruptcy court approval. After appointment of a trustee, a debtor no longer has standing to pursue a cause of action that existed at the time the order for relief was entered. Only the trustee has the authority and discretion to prosecute, defend, and settle, as appropriate in its judgment, such a cause of action. 2 COLLIER ON BANKRUPTCY ¶ 323.03[2], at 323–8 (Lawrence P. King et. al eds., 15th ed. rev.2001). *See also In re Dawnwood Properties/78*, 209 F.3d 114, 116 (2d. Cir.2000); *In re Martin*, 201 B.R. 338, 343 (Bankr.N.D.N.Y.1996).

■■■ Under the ethical rules relating to competent and zealous representation, F & H had the professional duty to disclose to the Mercurys the foregoing legal consequence of their status as Chapter 7 debtors, specifically, that the Chapter 7 Trustee owned and controlled their claims in the personal injury action and held the power to apply to the Court for approval of the settlement notwithstanding their objection. F & H also had the professional duty to advise the Mercurys of the simple expedient provided under the Bankruptcy Code to overcome the Chapter 7 Trustee's control over their personal injury action—conversion to Chapter 11.

■■■ Section 706(a) of the Bankruptcy Code provides as follows:

(a) The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.

Section 706(a) is clear and unambiguous. It provides the debtor an absolute right to convert from Chapter 7 to Chapter 11 "at any time." Any waiver of the right to convert is "unenforceable."

■■■ In spite of its seemingly absolute language, conversion under Section 706(a) "shall be on motion filed and served as required by Rule 9013." Fed. R.Bankr.P. 1017(f)(2).[11] Rule 9013 re-

---

11. Unlike conversion on request of a party in interest under Section 706(b), which requires "notice and a hearing," the text of Section 706(a) simply states that "[t]he debtor may

quires the motion to be in writing "unless made during a hearing." From a reading of these rules, it is apparent that while the Trustee correctly represented to Judge Connelly at the October 19, 2000 hearing that conversion is "generally done on motion," such a motion could have been immediately made by counsel acting on behalf of the Mercurys, or the entreaty by Gary Mercury at that hearing could have been treated as such a motion.

The Trustee's counsel was technically correct in stating that there is authority requiring a debtor's motion to convert under Section 706(a) to be made in good faith. *In re Krishnaya*, 263 B.R. 63 (Bankr.S.D.N.Y.2001); *Kuntz v. Shambam (In re Kuntz)*, 233 B.R. 580, 583 (1st Cir. BAP 1999); *In re Pakuris*, 262 B.R. 330 (Bankr.E.D.Pa.2001); *In re Sully*, 223 B.R. 582 (Bankr.M.D.Fla.1998); *Martin v. Cox (In re Martin)*, 213 B.R. 571 (E.D.Ark.1996); *In re Thornton*, 203 B.R. 648 (Bankr.S.D.Ohio 1996). But those courts that temper the debtor's absolute and unwaivable right to convert under Section 706(a) with a requirement of good faith have only denied a motion to convert in the presence of "extreme circumstances." *Finney v. Smith (In re Finney)*, 992 F.2d 43, 45–46 (4th Cir.1993) (denial of debtor's motion to convert from Chapter 7 to Chapter 11 permissible only after a finding of subjective bad faith and objective futility of a Chapter 11 reorganization); *In re Kuntz*, 233 B.R. at 585 (absence of extreme circumstances where debtor waited three months to notify trustee that he had received an inheritance); *In re Krishnaya*, 263 B.R. at 70 (not bad faith for debtor to seek conversion to Chapter 13 to avoid adversary proceeding under

Section 523(a) even where debtor's chance for success in Chapter 13 was slight); *In re Sully*, 223 B.R. at 585 (motion denied where debtor failed to disclose personal injury settlement proceeds to Chapter 7 trustee and where conversion was intended "to frustrate the bankruptcy process and regain control of the estate settlement proceeds"); *In re Martin*, 213 B.R. at 573 (extreme circumstances generally result from failing to disclose assets, attempting to escape debts rather than pay them, fraudulent misrepresentations to the court or manipulation of the Bankruptcy Code); *In re Thornton*, 203 B.R. at 652 (bad faith precluding conversion from Chapter 7 to Chapter 13 for failure to report assets and lying about property when questioned by trustee, combined with pre-petition overvaluation of assets and devaluation of liabilities).

Notwithstanding the good faith analyses in these extreme cases, which arise on motions required by Bankruptcy Rule 1017(f)(2) although not by Section 706(a), the debtor's right to convert remains nearly absolute. In this connection, note that 28 U.S.C. § 2075 states that the Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right," including the debtor's unqualified substantive right to convert granted in 11 U.S.C. § 706(a).

## II. *Analysis of the facts in light of the Rules*

There is one fact which is central to this contested matter and upon which all else turns: Robert Fellows and the F & H firm were attorneys for Gary and Mary Mercury in the personal injury action. That fact never changed.

convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time." The hearing required under Section 706(b) is treated as a contested matter under

Bankruptcy Rule 9014, but a hearing is not normally required for a motion under Section 706(a).

■ F & H had no ground to seek withdrawal under DR 2–110(B) or (C). They never sought to withdraw as attorneys for the Mercurys in the personal injury action. They were never relieved of their professional and contractual obligation to the Mercurys by consent of the Mercurys, or order or authorization of any court, or operation of law, or otherwise.[12] Indeed, F & H have never argued to the contrary.

As attorneys of record for the Mercurys in the personal injury action, F & H owed to the Mercurys all of the ethical, contractual and legal obligations of competence under Canon 6, zealous advocacy and fidelity under Canon 7 and undivided loyalty under Canon 5 quoted in point I, above. Without reiterating and juxtaposing the authorities and the acts and omissions of F & H set forth above, it is perfectly plain that F & H violated their retainer agreement and all of the ethical and legal rules discussed in point I.

■ There is an inherent adversity of interest between a debtor and his or her Chapter 7 trustee. While the differing interests of trustee and debtor may never blossom into open controversy in a particular case, actual conflict may arise on any of a host of matters, such as what is and is not property of the debtor's estate, fraudulent conveyances or other conduct of the debtor before or after filing the petition, challenge to discharge under Section 727(a), the trustee's conduct in pursuing or not pursuing potential assets of the debtor's estate, adversarial discovery proceedings and many other potential sources of conflict. An attorney can no more represent the interests of both trustee and debtor than he can the interests of debtor and creditor in a Chapter 7 case.

■ Nor, of course, can a lawyer switch sides by abandoning a client during controversy and representing his adversary against the client in the very same controversy. But that is what F & H did.

■ In this case there was an actual, luminous conflict between the Chapter 7 Trustee and the Mercurys with respect to the settlement of their personal injury action. The potential for that conflict was evident from the moment that the Mercurys expressed their disinclination to participate in a mediation. The conflict became patent during and after the mediation, not only because the Mercurys made clear their rejection of settlement and their desire to go to trial, but because the proposed settlement was palpably contrary to the debtors' interests, although it was recommended to the Trustee by F & H.

There can be no question that F & H recognized and fully appreciated the conflict of interest. Robert Fellows' letter to the Mercurys dated May 17, 2000 makes this abundantly clear. The letter stated, in its entirety:

Re: Mercury v. Church of the Immaculate Conception, et al.

Dear Mr. and Mrs. Mercury:

I am sending you a copy of an Order approving the retention of our firm as

---

12. The fact that F & H (by Steven Hymowitz) made an *ex parte* motion to withdraw as counsel for the debtors in their Chapter 7 bankruptcy case had no effect on their contractual and ethical obligations as the Mercurys' attorney in the personal injury action. Aside from the fact that F & H's failure to give notice of the withdrawal motion to the Mercurys was a violation of law and ethics, the court order relieving F & H as counsel for the debtors in the Chapter 7 case did not purport to and could not diminish F & H's obligations as personal injury counsel. It should also be noted that the single ground asserted in the withdrawal motion (that F & H were not being paid) would not have applied to their retainer in the personal injury action, where their entitlement to a fee was contingent.

special litigation counsel to the bankruptcy Trustee concerning your pre-petition personal injury action.

**We are now representing the bankruptcy Trustee in this matter and since the interests of the Trustee may diverge from your own interests, I believe I am obligated to tell you that you have the right to retain counsel in connection with proceedings in the Bankruptcy Court which revolve about the personal injury action and my recommendation to the Trustee that it be settled for the sum of $190,-000.**

Your attention is appreciated.

Very truly yours,

/s/ Robert L. Fellows

(Emphasis supplied).

At the January 29, 2002 evidentiary hearing Mr. Fellows and F & H's counsel appeared to suggest that there was no conflict of interest because after the bankruptcy filing F & H somehow became answerable to the Trustee and required to serve the best interests of the estate, rather than the interests of the debtors (*see, e.g.,* the Fellows testimony quoted in footnote 4), or perhaps because F & H's allegiance as counsel in the personal injury action was to the *claim,* so that when the claim became part of the debtors' estates F & H's ethical and legal duties as counsel also were transferred to the estate. Such arguments, if such were indeed their arguments, are baseless. The attorney-client relationship exists between the attorney and his client, and counsel's ethical, contractual and legal obligations are owed *to the client,* not the client's claim and certainly not to a debtor-client's Chapter 7

trustee, whose interests are fundamentally adverse to those of the debtor.

It often happens that a debtor's Chapter 7 estate includes a pre-petition personal injury claim or other legal chose in action. Typically, after investigating the debtor's pre-petition claim the Chapter 7 Trustee will apply to the Court for permission to retain the debtor's attorney in the state court action as special counsel to the Trustee to prosecute or settle the claim. Despite the potential adversity of interest between the debtor and the Chapter 7 Trustee, Section 327(e) permits the retention of the debtor's state court attorney as special counsel to the Trustee, but *only if* "such attorney does not represent or hold any interest adverse to the debtor or to the estate *with respect to the matter on which such attorney is to be employed"* (emphasis supplied). In the normal case there is no actual conflict between the debtor and the Chapter 7 Trustee as to the state court action because the success or failure of the claim has no economic effect on the debtor.

But this was not a normal case. A substantial jury verdict was vital to the Mercurys, whereas the settlement benefit to them was trivial. When the Mercurys rejected settlement and asked to proceed to trial it was F & H's obligation to take the case to trial, as made clear by the authorities in point I(A)(2), above, and as both Mr. Fellows and F & H's counsel acknowledged at the January 29, 2002 evidentiary hearing.[13] They did not do so. It was F & H's obligation to clearly and unambiguously advise the Mercurys that a "downside risk" of proceeding to mediation was that the Chapter 7 Trustee was legally

---

13. *See* Fellows' testimony at Tr. 139–140 and the following answer of F & H's counsel to a question by the Court:

THE COURT: But suppose you explain everything and the client says, "I would rather go to trial and lose then [sic] accept this amount of money." Then what?

MR. MERKIN: Then you go to trial. (*Id.* at 11–12)

in control of their personal injury claim and might be successful in persuading the Court to approve a mediation settlement despite their opposition. F & H not only failed to do so, but advised the Mercurys that there was no risk in going to mediation because, if the proposed settlement were not acceptable to them, they could always proceed to trial. F & H had the obligation to advise the Mercurys as to the conflict between their interests and those of the Chapter 7 Trustee with regard to the question of settlement, to explain to the Mercurys what steps they might take if the Trustee were to apply to the Court for approval of the settlement, and to act with competence and zeal to protect the Mercurys' right to a trial notwithstanding the Trustee's desire to settle the action. F & H acted in defiance of all of these obligations. They repudiated their contractual, ethical and legal duties as counsel for the Mercurys by abandoning their clients and joining in the Trustee's application to retain F & H as special counsel to the Trustee for the precise purpose of moving for Court approval of the settlement which their clients had rejected.

The consequence of counsel's apostasy was disastrous for the Mercurys. Had F & H zealously urged the Chapter 7 Trustee to permit the Mercurys to go to trial, as they were ethically required to do under the authorities in point I(A)(1), above, it is quite likely that the Trustee would have had no alternative but to accede to the position of the debtors and their trial counsel. If, nevertheless, the Chapter 7 Trustee moved to settle the personal injury action, F & H were contractually and ethically bound to represent the Mercurys in opposition. In addition, F & H had the ethical duty to advise the Mercurys of their right to trump the Chapter 7 Trustee's attempt to settle by the simple expedient of a motion to convert to Chapter 11. Mr. Mercury's reference to conversion to

Chapter 11 at the October 19, 2000 hearing failed not for lack of merit but for want of an attorney to present the issue as a written or oral motion and to rebut the baseless opposition to conversion advanced by the Trustee's counsel. In fact, the debtors' case ultimately was converted to Chapter 11 by order of this Court after the debtors finally succeeded in obtaining competent counsel, on a motion to which the Trustee *offered no non-frivolous opposition*.

█ The putative economic harm to the Mercurys cannot be calculated in dollars and cents, because it cannot be known whether they would have been successful on liability and if so, what damages the jury might have awarded. What is clear, however, is that the breach by F & H of their contractual, ethical and legal obligations to the Mercurys deprived the Mercurys of their right to a jury trial and the possibility of a recovery far exceeding the $190,000 settlement. In so doing, F & H forfeited their right to compensation and reimbursement of expenses under their retainer agreement with the Mercurys.

Compensation and reimbursement of expenses is also barred under Section 327(c) of the Bankruptcy Code and the numerous cases cited and discussed under point I(B)(1)(c), above. In the Chapter 7 Trustee's Application to retain F & H as special counsel, the Trustee's attorney certified as follows:

7. To applicant's knowledge, the said attorney has no connection with the Debtors, their creditors or any other party in interest or their respective attorneys, except that the Fellows Firm previously represented the Debtors in the State Court Action and assisted the Debtors in connection with this case. Both of these matters are more fully

explained in the affidavit of Mr. Fellows that is annexed hereto.

8. Applicant believes, as set forth in the annexed affidavit of Robert L. Fellows, Esq., that said counsel represents no adverse interest to the Chapter 7 Trustee or the estate herein in the matters upon which said firm is to be engaged, and that their employment would be in the best interest of this estate.

In his affidavit in support of the Trustee's April 6 special counsel retention motion, Mr. Fellows made the following certification:

8. That neither your deponent nor this law firm represents an adverse interest to the Trustee of the estate herein in the matters upon which it is to be engaged and that the firm's employment would be in the best interest of this estate.

These certifications of "no adverse interest" were false, and were known to be false,[14] when the special counsel retention motion was filed in early April. The mediation was held and concluded on either February 4 or February 18. Counsel knew that the Mercurys had rejected the proposed settlement and wanted a jury trial. F & H could not comply with the requirement of Section 327(e) that F & H "does not represent . . . any interest adverse to . . . the estate with respect to the matter on which such attorney is to be employed," because F & H had the contractual, ethical and legal obligation to represent the Mercurys in opposition to the Chapter 7 Trustee on the question of settlement. Had counsel disclosed to the Court that F & H's clients, the debtors, were bitterly adverse to the Trustee on the

crucial issue of settlement, the Court could not have approved F & H's retention as special counsel to the Trustee.

The sanction under Section 327(c) for F & H's failure to disclose their conflict of interest and their consequent retention in violation of Section 327(e) is forfeiture of all compensation and reimbursement of expenses.

### Conclusion and Order

Upon the foregoing decision, the application on behalf of F & H for attorneys' fees and reimbursement of expenses is hereby denied.

IT IS SO ORDERED.

---

14. This clause of this finding would not apply to the Trustee's counsel's certification if it were so that Mr. Fellows had withheld from the Trustee the fact that the Mercurys had rejected the settlement and wanted a jury trial. Although an inference may be drawn from the self-evident disadvantage of the settlement to the debtors, the evidence is insufficient to warrant a finding on this point one way or the other.